ELWYN W. LOVEJOY *vs.* WILLIAM C. BAILEY & others.
W. FRANK FOWLE *vs.* SAME.

Middlesex. December 10, 11, 1912. — February 27, 1913.

Present: HAMMOND, LORING, BRALEY, & SHELDON, JJ.

*Equity Jurisdiction,* To relieve from results of fraud, Accounting. *Partnership. Equity Pleading and Practice,* Bill, Parties, Intervening petition. *Fraud. Conspiracy. Joint Tortfeasors. Survival of Suit. Trust,* Constructive. *Contract,* Implied in law. *Landlord and Tenant.*

A bill in equity against the two members of a partnership, two other individuals and two corporations contained allegations of the following facts: The plaintiff lent to one of the partners $5,000 to be used by the partnership, and that partner with the consent of the other partner agreed in writing to pay to the plaintiff for the use of the money one half of his share of the profits of the partnership, and, on dissolution of the firm, to convey to the plaintiff in payment of the loan one half of his share in the assets of the firm. Later the plaintiff made a similar loan to the other partner in return for a similar agreement, and both partners also agreed with the plaintiff in writing that certain real estate which belonged to the partnership should remain partnership property. One of the partners absconded and the other partner, with the assistance of the other individual defendants, caused the two defendant corporations to be organized for the purpose of absorbing the assets of the partnership, and in fraud of the plaintiff's rights caused the partnership assets to be conveyed to those corporations, each receiving part, the conveyance of the real estate and of a part of the personal estate being accomplished by means of colorable assignments to one of the individual defendants of certain mortgages, colorable foreclosures of the mortgages, purchases at the foreclosure sales and conveyances by the purchaser to one of the corporations. The defendants demurred to the bill for want of equity and for multifariousness. *Held,* that, although the plaintiff was not as to the members of the firm a partner, the bill might be maintained under R. L. c. 159, § 3, cl. 6, for an accounting and, under cl. 7, to reach and apply, in satisfaction of what should be found to be due to the plaintiff from the partners, the property which, through fraud of all of the defendants excepting the absconding partner, was taken from the partnership and placed in their control. *Held, also,* that the bill was not multifarious, because it was not necessary for the plaintiff to bring a separate bill as to each separate loan against each partner, and because by the bill the plaintiff sought to avoid the effects of a single scheme of fraud participated in by all the defendants except the absconding partner, who was a necessary party, and to enforce a general right with which all the matters alleged were connected.

It is not indispensable that all the parties to a suit in equity should have an interest in all the matters alleged in the bill. It is sufficient if each party has an interest in some of the matters alleged and that those matters are connected with the others.

In a suit in equity it appeared that the defendants, acting in concert and in fraud of rights of the plaintiff, induced the mortgagee of certain personal property to assign the mortgage to one of them, who made a colorable foreclosure thereof for their benefit. The mortgagee was not a party to the bill. *Held*, that the liability of the other defendants was the same whether the mortgagee was an innocent tool or was an active participant in the execution of the fraudulent device.

In a suit in equity it appeared that the plaintiff had made a separate loan to each of the two partners of a firm and had agreed in writing with each that he should have for the use of his money a certain part of the share of such partner in the profits of the firm and, in payment of the loan, a certain part of his share of the assets of the firm upon its dissolution, and that both partners agreed that certain real estate should remain a part of the firm's assets; that, one of the partners becoming incapacitated, the other partner and certain individuals formed two corporations to which they caused to be conveyed all the personal property and real estate of the firm, in conveying some of the property using the fraudulent devices of colorable foreclosures of mortgages of which they had got control, colorable purchases at foreclosure sales and colorable conveyances by the purchasers to one of the corporations. The partners and their fellow conspirators and the corporations were defendants. An interlocutory decree was made ordering an accounting to ascertain what was due to the plaintiff, declaring the sale in foreclosure of the real estate to be void and directing those of the defendants to whom had been conveyed any of the assets of the firm to convey them to a receiver to be appointed unless the defendants should give a bond conditioned on the payment to the plaintiff of what should be found to be due to him upon the accounting. The defendants appealed. *Held*, that the decree did not give to the plaintiff any more than he was entitled to.

In a suit in equity against two partners, two other individuals and two corporations, it appeared that the plaintiff had lent money to each of the two partners and that each partner, with the assent of the other, had agreed in writing with the plaintiff to pay to him for the use of the money one half of such partner's share of the profits of the firm, and in payment of the loan one half of his share of the firm's assets on dissolution, that, one partner becoming incapacitated, the other partner and the two individuals conspired to defraud the plaintiff by fraudulently taking the assets of a partnership, that the fraudulent partner and one of the individual defendants formed one of the corporations for that purpose and that a part of the partnership assets were conveyed to it, that the individual defendants other than the partner who was incapacitated then, by colorable sales in foreclosure of mortgages of which they procured control, gained possession of other assets of the partnership, formed the second corporation and conveyed to it the assets thus obtained as well as all the remaining assets of the partnership, and that all such acts were done in pursuance of a fraudulent scheme by all the defendants to defraud the plaintiff. *Held*, that all of the defendants except the incapacitated partner were in equity jointly liable to the plaintiff as joint tortfeasors, and that none of them could escape such joint liability either because he did not come into the fraudulent scheme until it had been formed and partly executed, or because the different defendants did not concern themselves with each others' wrongful gains, but took in severalty their respective shares thereof.

The right of recovery in a suit in equity against several defendants who by fraudulent conduct in which all joined took all the assets of a partnership in which the plaintiff was interested, survives the death of any defendant and can be en-

forced against his estate, because the right is in its nature quasi-contractual and the defendants are held as constructive trustees of the property for the plaintiff's benefit.

In a suit in equity against several defendants it appeared that the plaintiff was interested in the profits and assets of a partnership and that the defendants devised a fraudulent scheme for depriving the partnership of certain real estate by procuring control of a mortgage thereon, which secured a debt owed by the firm, and by carrying through a colorable foreclosure sale and conveyance to one of themselves; that in the carrying out of the scheme one of the defendants paid to the mortgagee the amount due on the mortgage. In an accounting to determine how much the defendants owed to the firm by reason of their fraudulent acts, it was *held,* that, while the defendant who paid off the mortgage could not be subrogated to the rights of the mortgagee as to the amount he had paid because the doctrine of subrogation is an equitable doctrine and he did not come into equity with clean hands, nevertheless, since he practically had paid a debt of the firm, the defendants were entitled in the accounting to credit as for the payment of an old firm debt.

In a suit in equity in which it appeared that the defendant fraudulently had procured possession of real estate and personal property in which the plaintiff was interested, which he was ordered to return to the plaintiff, an accounting was ordered in which the defendant was charged with rent and depreciation of the property, and it was *held,* that, in such accounting, the defendant should be credited with sums of money which he had paid for taxes, but not with amounts which he had paid for insurance premiums or repairs.

In a suit in equity against a number of individuals and corporations, it appeared that the individual defendants by a fraudulent scheme had procured possession of the good will and property of a partnership in which the plaintiff was interested and had conveyed them to the defendant corporations which they had organized for that purpose and of which they were the officers. It also appeared that the corporations did some other business besides that of the partnership which they had taken over. The corporations were held to account for the profits made by them from the business formerly of the partnership. The corporations had paid the individual defendants salaries as officers, which a master held were not fraudulent or excessive. *Held,* that credit should not be allowed in the accounting for the entire amount of the salaries paid to the individual defendants by the corporations which were organized in part for the carrying out of their fraudulent schemes, but that, under the circumstances, a part of the salaries which was proportionate to the amount of the business of the corporations which was not business taken from the partnership should be allowed as an offset in determining the profits of the corporations.

In a suit in equity against two partners, two other individuals and two corporations, it appeared that, one of the partners becoming incapacitated, the other partner conspired with the other individual defendants and formed the defendant corporations to which in fraud of the plaintiff they procured that the assets of the partnership should be conveyed. In the formation of one of the corporations the fraudulent partner received some capital stock which he afterwards sold to one of the other defendants at a profit. The defendants being held jointly liable as joint tortfeasors in equity and ordered to account for their dealings with the property of the firm, it was *held,* that the profit made by the fraudulent partner from the sale of the capital stock must be charged against him

as a profit made in dealing with the firm property, and that, the defendants being jointly liable, the charge was also a proper one against all of the other defendants excepting the incapacitated partner.

In a suit in equity against several persons who by conspiring together fraudulently attained possession of all of the property of a partnership, a creditor of the firm was allowed to intervene. A receiver of the property thus procured from the firm having been appointed, the creditor's claim was allowed by him, and it was *held*, that, if the receiver on his final accounting should have sufficient funds to pay the intervening creditor, he should do so and the intervening petition should be dismissed without prejudice; but that, if the funds in the hands of the receiver were insufficient to satisfy the claim of the intervening creditor, he was entitled to a decree against all of the defendants jointly.

BILL IN EQUITY, filed in the Supreme Judicial Court on February 24, 1903, which, as afterwards amended, was by Elwyn W. Lovejoy against William C. Bailey, W. Frank Fowle, Fred L. Blendinger, the Orange County Trust Company, executor of the will of Francis W. Clemson,* the Bailey-Blendinger Manufacturing Company, and the Clemson-Bailey Company; also a

BILL IN EQUITY, filed in the same court on March 19, 1904, which, as afterwards amended, was by W. Frank Fowle, alleged to be an insane person, who brought the suit by John L. Fowle, his guardian, against Bailey, Lovejoy, the Bailey-Blendinger Manufacturing Company, the Clemson-Bailey Company, and Julia A. Scalley, administratrix of the estate of Thomas Salmon.

The allegations of the bill in the first suit were in substance as follows: On May 5, 1900, Bailey and W. Frank Fowle formed a partnership under the name of Fowle Brothers and Company, to carry on the business of manufacturing and dealing in knives, saws and other articles, and on that day Lovejoy lent $5,000 to Bailey and he and Bailey made an agreement in writing by the provisions of which Bailey was to put the money into the partnership business and was to give Lovejoy, for the use of the money, one half of all his share in the profits of the business during the continuance of the copartnership, and in payment of the principal one half of all his share of the assets remaining upon dissolution of the firm and settlement of the accounts between the partners. On July 3, 1900, Lovejoy lent Fowle $5,000, and made with him a similar agreement in writing, and Fowle and Bailey agreed with Lovejoy in writing that certain real estate of the firm

---

* Clemson originally was a party. He died on October 18, 1910, and the executor of his will became a party on January 2, 1911.

should remain as a part of the partnership assets. When these agreements were made there were two outstanding mortgages on the partnership property, one on its real estate and the other on its machinery. The business carried on by the firm was successful and prosperous and large profits were realized, and Bailey and Fowle received from time to time large sums of money as profits from it; but the plaintiff never received from either Bailey or Fowle any part of the share of either Bailey or Fowle in the profits, or any share of the assets of said firm. Bailey and Fowle never rendered any account of the business to the plaintiff, and the plaintiff was ignorant of the amount of the profits derived from the business or of the amount received by either Bailey or Fowle for his share of the profits. About November 24, 1902, Fowle absconded, and Bailey, with the assistance of Clemson and Blendinger, caused the defendant corporations, the Bailey-Blendinger Manufacturing Company and the Clemson-Bailey Company, to be organized for the purpose of absorbing the assets and business of the partnership, and to those two corporations, each taking part, the assets of the partnership were conveyed in fraud of the plaintiff's rights, the real estate being conveyed by means of a colorable assignment to Clemson of a mortgage thereon, a colorable foreclosure by Clemson and a colorable conveyance in foreclosure to Blendinger and from him to the Bailey-Blendinger Company. Similar methods were used with regard to a foreclosure of a mortgage on part of the personal property of the partnership, and the remainder of it was conveyed to one or the other of the defendant corporations, all the facts being known to all of the officers of the two corporations.

The prayers of the bill were for (1) specific performance of the agreements with Bailey and Fowle; (2) the dissolution of the copartnership; (3) an accounting for the shares of Bailey and Fowle in the profits and assets of the firm; (4) a setting aside of the conveyances of partnership assets and the foreclosures; (5) the appointment of a receiver for the firm; (6) an injunction restraining the defendants from, meddling with the partnership property; and (7) general relief.

The allegations of the bill in the second suit were in substance that the copartnership agreement between Bailey and Fowle, the agreement with Lovejoy referred to in the other bill, and all acts

of Fowle during the period covered by the transactions in question were void because he was of unsound mind; that Bailey's conveyances of property and the foreclosures of the mortgages were fraudulent and void, and that the two defendant corporations took with knowledge of the fraud.

The prayers of the bill in the second suit were (1) that all the property of the alleged partnership be reconveyed to Fowle; (2) that all his alleged contracts be declared void; (3) that a receiver be appointed pending the suit; and (4) that the defendant be compelled to account for all rents and profits.

In the first suit, the defendants demurred to the bill, assigning, among other grounds for demurrer, want of equity and multifariousness. The demurrers were heard by *Braley*, J., and were overruled. The defendants appealed.

The suits were referred to Homer Albers, Esquire, as a master to be heard together.

In his first report the master found in substance, among other facts, the following:

Previous to June 12, 1899, Fowle had been engaged in the business of manufacturing belt knives and similar articles, and owned certain land at Woburn and buildings, machinery and tools which were used in the business. On June 12, 1899, Fowle mortgaged the real estate to the City Institution for Savings of Lowell to secure a loan of $6,000, of which, before the events alleged in the bill, $1,000 was paid. One Thomas Salmon indorsed the mortgage note with Fowle and Fowle gave him a mortgage on his machinery and tools to indemnify him against loss which might arise from such indemnity.

Previous to October 31, 1899, Bailey had been employed by a firm of which Lovejoy was a member. At about that time Fowle and Bailey entered into partnership and there were a series of partnership agreements made between them until an agreement was made on July 3, 1900, and was dated back to May 5, 1900. In the meantime Lovejoy had made the two loans of $5,000 each to Bailey and to Fowle, described in the bill in the first suit. The partnership agreement referred to provided that Fowle and Bailey should be and were equal partners in the assets (including real estate) and profits and recited that Bailey had "purchased" an additional interest and "now owns one half part of all" the

real estate and personal property and accounts; that Bailey should have the sole and exclusive management and control of the business, and that Fowle should personally assume all debts of the firm which did not appear on a schedule attached to the agreement. This schedule (which was made up by the book-keeper) omitted about one hundred items of indebtedness amounting to $14,722.53 and also omitted the mortgage indebtedness of $5,000.

The master found that "at this time Bailey had acquired an undue influence over Fowle; that Fowle did not understand, and that his mental condition was such that he could not without careful explanation understand, the effect of the clause by which he assumed the indebtedness and that Bailey knew this; that the clause was not carefully explained to him and that this clause was inserted by reason of the undue influence of Bailey, and" he therefore ruled "that Bailey should take no profit or advantage from said clause of said agreement."

The master further found that Lovejoy had no notice or knowledge of any impairment of the mental capacity of Fowle at the time of the making of his two loans to Bailey and Fowle, and he ruled that there was nothing to justify setting aside the agreements between Lovejoy and Fowle relating to those loans.

In the summer of 1902 Fowle discontinued all active participation in the business. Bailey knew that Fowle probably would know nothing of whatever he might do.

In July and August, 1902, the firm of Fowle Brothers and Company being again in financial straits, Bailey associated with Clemson and caused the defendant Clemson-Bailey Company to be organized. In August, Bailey sold or made a pretence of selling the belt knife business, which theretofore had been a part of the business of Fowle Brothers and Company, to the Clemson-Bailey Company, receiving $4,200 which he put into the business of Fowle Brothers and Company, using it in payment of partnership debts. Bailey immediately received one half of the shares of the capital stock of the Clemson-Bailey Company, and gave his (Bailey's) unsecured note for $2,500 to Clemson for this stock. After its organization the Clemson-Bailey Company manufactured and furnished knives for Fowle Brothers and Company for a fair and reasonable price. The business of the Clemson-Bailey Com-

pany, after the sale, was conducted in the works formerly of Fowle
Brothers and Company, and was profitable. The Clemson-Bailey
Company paid to Fowle Brothers and Company a rental of $50
a month until the foreclosure of the mortgage of the real estate.
Clemson and Bailey each drew salaries from the Clemson-Bailey
Company of $50 a week. About September 19, 1904, Clemson
bought back from Bailey his one half of the capital stock of the
Clemson-Bailey Company, Bailey delivering the certificates of
stock to Clemson and Clemson returning to Bailey his note of
$2,500, upon which nothing' had been paid, and in addition
$3,355.35.

In September, 1902, Salmon consulted George W. Norris, Es-
quire, regarding his mortgage on the machinery.. On September
19, Mr. Norris, by arrangement with Bailey, delivered or caused
to be delivered to Bailey the statutory notice of intention to fore-
close this mortgage, Bailey in behalf of Fowle Brothers and Com-
pany accepting service of the notice. Bailey then arranged that
Clemson should purchase from the City Institution for Savings the
mortgage on the real estate, and on September 24, 1902, this
mortgage on the real estate was assigned to Clemson for $5,000
paid to the bank. At the time of this assignment the principal of
the mortgage note was due, but Bailey paid the interest to the
date of the assignment, so that no interest was overdue and the
mortgagee was not pressing for payment of the principal, though
it had notified Fowle Brothers and Company that $1,000 of the
principal must be paid by July, 1902.

At some time in September, 1902, Lovejoy told Bailey that he
(Lovejoy) intended to take a hunting trip in the autumn in Maine.
Bailey knew that Lovejoy almost annually took such a trip. On
October 25, 1902, Lovejoy started on this trip. On October 31,
1902, Bailey consulted Mr. Norris in regard to "foreclosure."
The next day Clemson consulted Mr. Norris and gave to him the
real estate mortgage to have it "foreclosed," and Mr. Norris on
the same date caused the first notice of a mortgagee's sale to be
published in a small daily paper which had recently been estab-
lished in Woburn, to wit, the Daily Times, which, while not a
paper unsuitable for the publication of mortgagees' sales, was the
paper in Woburn which would be the least likely to come to the
attention of Lovejoy. Bailey was anxious to keep from Lovejoy

all knowledge of the sale, and Clemson was desirous of doing whatever Bailey wished.

On November 4, 1902, Bailey consulted Mr. Norris "concerning machinery, fixtures, corporations, etc." On November 8, 1902, articles of incorporation of the defendant Bailey-Blendinger Manufacturing Company were signed, Mr. Norris acting as attorney for the incorporators. At about this time Blendinger agreed with Bailey that if he, Blendinger, bought the factory he would go into business with Bailey and give Bailey one half of the stock of the corporation, which should own and conduct the business.

The master found "that Bailey deliberately arranged the foregoing for the purpose of defrauding Fowle and Lovejoy of any possible interest in the business. If his plans as outlined above were successfully accomplished he, or he and his associates, would own the real estate and machinery, but there remained considerable stock on hand which belonged to the partnership and which was not covered by the mortgages. So on or before November 15, 1902, Bailey consulted Mr. Norris as to his right as a partner to sell the stock on hand and other personal property of the firm. Mr. Norris gave a written opinion that Bailey had this right, with certain qualifications, if it was to pay debts of the firm. On November 24, 1902, the sale of the real estate under the power of sale mortgage took place as advertised. Blendinger was there with money to purchase. He testified that he was ready and willing to pay $5,000 for real estate and machinery, but how to divide his offer or bid so that after buying the real estate he would be sure to get the machinery, and both for not more than $5,000, he did not know. He testified that he left this and all other details to Mr. Norris, who was acting as his attorney. It is clear that Mr. Norris would have been faithless to his duty and would have been acting for conflicting interests if his several clients were all acting in good faith and in the performance of their obligations and apparent interests. But all these clients were acting in concert for the purpose of getting the business and property of Fowle Brothers and Company, so Mr. Norris was not actually acting for conflicting interests. Salmon wanted nothing more than to be relieved from his liability on the mortgage note, and that was being accomplished."

Blendinger bought the real estate at the foreclosure sale for $2,500, and gave his uncertified check for $500 on account of the purchase price. Upon the same day and immediately after the mortgagee's sale a deed, which had already been prepared by Mr. Norris, was executed by Clemson under the power in the mortgage, conveying the real estate to Blendinger, but the check for the balance of the purchase money was not given until November 25, 1902. On the day of the sale (November 24) the organization of the defendant Bailey-Blendinger Manufacturing Company was completed by Bailey, Blendinger and associates.

Salmon received from Blendinger a check for $2,886.07, which he immediately indorsed to Clemson and delivered, with a bill of sale of what was covered by the personal property mortgage, to Mr. Norris as attorney for Clemson. Mr. Norris then cancelled Salmon's name from the note secured by the mortgage of the real estate. Thereupon Bailey gave a bill of sale executed by him in the name of Fowle Brothers and Company to Blendinger of the merchandise and stock on hand, and for this Blendinger paid $10,110. This money was used by Bailey in paying some of the debts of Fowle Brothers and Company. Thereupon Blendinger conveyed and transferred all that he had purchased to the defendant Bailey-Blendinger Manufacturing Company, and gave to Bailey one half of the shares of capital stock of that company in accordance with the previous arrangement.

The price paid at the auction sale of the land and that paid for the machinery were inadequate. The business carried on by Fowle Brothers and Company was special in character, there being only about twenty-five such manufactories in the United States. No effort was made to bring the sale of this business to the attention of the other persons engaged in such business. A prudent man owning such property and desiring to secure a purchaser would have caused such other manufacturing concerns to be notified of such sale.

Lovejoy had no knowledge or notice of any of the transfers until January 10, 1903.

The master further found that the sale of a portion of the business to the defendant Clemson-Bailey Company was made by Bailey for the purpose of defrauding Fowle and Lovejoy and that Clemson and the Clemson-Bailey Company knew or had notice of

this purpose; that the foreclosure of the personal property mortgage and the sale thereof by Salmon, the mortgagee's sale of the ⊁ real estate by Clemson, the sale of the personal property by Bailey in the name of Fowle Brothers and Company, and the sales by Blendinger to the Bailey-Blendinger Manufacturing Company were all made in pursuance of a fraudulent scheme by the parties to defraud Fowle and Lovejoy, and that the sales were a mere pretence and cover to procure an apparent title to the property so transferred.

The master refused to find that the parties engaged in the foreclosure knew of the interest of Lovejoy in the business, and found that Mr. Norris knew that Lovejoy had an interest, that Clemson and Bailey knew that Lovejoy had an interest, and that, from the knowledge of those persons the defendant corporations and Blendinger had notice or knowledge of Lovejoy's interest.

The defendants filed exceptions to the master's first report, among which were the following:

18. To the ruling of the master that Bailey should take no profit or advantage from the clause in the partnership agreement dated May 5, 1900, by which Fowle assumed all indebtedness not mentioned in the schedule attached thereto.

23. To the ruling of the master that the facts found would justify setting aside the clause in the copartnership agreement dated May 5, 1900, between Fowle and Bailey, whereby Fowle agreed to assume and pay debts not on the schedule referred to in said agreement.

32. Because the master passed upon the question of the validity of the foreclosure of the Salmon mortgage, neither Salmon nor his personal representatives being parties to either of the bills.

33. Because the master failed to find that Clemson paid the City Institution for Savings the entire $5,000 then due on their mortgage when he took the assignment thereof.

The exceptions were heard by *Morton*, J., who made a decree which was entered on August 8, 1906, and which overruled the exceptions to the report and confirmed the report, dissolved the partnership between Fowle and Bailey, declared the foreclosure sale under the mortgage upon the real estate to be void, ordered the Clemson-Bailey Company, Blendinger and the Bailey-

Blendinger Company to convey to a receiver of Fowle Brothers and Company, if appointed, whatever had been transferred to them of the property formerly of the partnership, ordered accountings of the profits of the Clemson-Bailey Company and of the Bailey-Blendinger Company since their respective organizations, declared that portion of the copartnership agreement between Fowle and Bailey, dated May 5, 1900, whereby Fowle assumed payment of all previous indebtedness of the firm not included in the schedule annexed to the agreement to be void and of no effect, and also ordered as follows in substance: That the defendants give bond with Bailey as principal to the plaintiff Lovejoy in the penal sum of $20,000, with surety satisfactory to the clerk of the court within thirty days from the date of the decree, conditioned upon the payment by the defendants or either of them within thirty days after final decrees of all sums that might by such decrees be determined to be due from them and either of them to the plaintiff Lovejoy and to the plaintiff Fowle or his guardian or to Fowle Brothers and Company; and in default of the giving of such a bond, John G. Maguire of Woburn was appointed receiver of the firm of Fowle Brothers and Company to collect and receive the assets of that firm and preserve them until the further order of the court.

The decree, as afterwards amended, also directed the recommittal of the cases to the master for the stating of the accounts between Fowle and Bailey and between Fowle Brothers and Company and Lovejoy and between Bailey and Lovejoy and Fowle and Lovejoy from and after May 5, 1900, to state the value of the assets of Fowle Brothers and Company taken by the defendants or by any of them, the net profits of the Clemson-Bailey Company and the net profits of the Bailey-Blendinger Manufacturing Company from the dates of their respective organizations as above provided, and the proportions of such net profits that might equitably be regarded as derived from the property and business taken from Fowle Brothers and Company as a going business, including the good will.

The defendants appealed from the foregoing decree.

The defendants not giving the bond described in the foregoing decree, the receiver was appointed on September 7, 1906, in accordance with the decree.

On March 5, 1907, a petition of the plaintiff that Julia A. Scalley, administratrix of the estate of Thomas Salmon, be admitted as a defendant, was allowed. She filed an amended answer alleging among other things that her intestate "received no funds or other proceeds" of the mortgage, and that, being relieved from any liability as an indorser of Fowle's note to the bank, he ceased to have any interest of any kind under the mortgage; that Salmon had died on January 9, 1903, that she had given bond as administratrix on January 15, 1903, had made due publication of notice of her appointment and affidavit thereof, had fully administered the estate and had filed her final account in the Probate Court which had been allowed on June 13, 1905. The plaintiff in both cases filed a stipulation that "all allegations of fact in the amended answers of" the administratrix "are admitted to be true."

On September 20, 1907, one Gordon Parker, a creditor of Fowle Brothers and Company, filed by leave of court an intervening petition setting up a claim of $1,399.87. This claim, with interest, afterwards was allowed by the receiver together with claims of John L. Fowle and the Clemson-Bailey Company. Claims of the estate of Clemson for $5,000 and of Blendinger for $19,016.26, were disallowed by the receiver.

The master filed a second report containing detailed statements of the accounts called for by the interlocutory decree of August 8, 1906. In his findings, as directed by that decree, as to "the assets of Fowle Brothers and Company taken by the defendants or any of them," he found that the Clemson-Bailey Company took a good will worth $500 and merchandise worth $4,200, for which it paid $4,200; that the Bailey-Blendinger Manufacturing Company took a good will worth $1,000, and merchandise, supplies, machinery and other personal property and real estate worth $21,625.89, for which it paid $15,066.39. He found that Bailey was liable to the partnership for the foregoing, among other items, but made no finding as to any asset that any other defendant had taken or as to any liability of any other defendant for the property taken by the two corporations.

In his findings, as directed by the interlocutory decree of August 8, 1906, as to the net profits of the Bailey-Blendinger Manufacturing Company, the master computed the amount of such net profits

due to the partnership in proportion to the amount of property of the partnership which the corporation was using in its business.

Other findings of the master in his second report, which are material to the decision, are described in the opinion.

The plaintiff Lovejoy, among other exceptions to the report, filed the following:

"26. For that the master has failed to state the account on the theory that the defendants Clemson and Bailey are jointly and severally liable with the Clemson-Bailey Company for the fair value of all the assets of Fowle Brothers and Company taken by the defendants and transferred to said Clemson-Bailey Company, and for all the profits derived by said Clemson-Bailey Company therefrom; whereas the master, as matter of law, should have so stated his account.

"27. For that the master has failed to state the account on the theory that the defendants Clemson, Bailey and Blendinger are jointly and severally liable with the Bailey and Blendinger Manufacturing Company for the fair value of all the assets of Fowle Brothers and Company taken by the defendants and transferred to the Bailey and Blendinger Manufacturing Company, and for all the profits derived by said Bailey and Blendinger Manufacturing Company therefrom; whereas, the master, as matter of law, should have so stated the account."

The plaintiff Fowle filed similar exceptions.

The defendants filed many exceptions to the second report, the twenty-sixth of which was to the method in which the master computed the net profits of the Bailey-Blendinger Manufacturing Company, setting forth that those computations of the master "are erroneous because the net profits as there made up by him, do not include any deduction from the gross income of the Bailey-Blendinger Manufacturing Company because of their liability to pay rental."

The exceptions were heard by *Rugg*, J., on July 28, 1910, and a decree was entered sustaining those above described, and in all other respects confirming the report, and recommitting the case to the master for certain further findings.

The master filed a third report containing findings on the matters specified in the decree, findings as to payments by the Bailey-Blendinger Manufacturing Company for taxes, insur-

ance and repairs on the property which it had received from the partnership, and the following:

"No additional evidence was offered before me bearing on the question of the joint and several liability of the defendants Bailey, Clemson, Blendinger, Bailey-Blendinger Manufacturing Company and the Clemson-Bailey Company, but upon the evidence heretofore submitted and reported by me with my first report, which evidence was also by agreement of parties to be considered by me so far as it bore upon the matters involved in my second report, I make the following additional findings:

"(a) The defendants Blendinger and Salmon had nothing to do with the organization of the Clemson-Bailey Company, or with the sale by Bailey of any portion of the business of Fowle Brothers and Company to said company, did not participate in any way in said transaction, nor in the business of said company, nor derive any profit therefrom.

"(b) The Clemson-Bailey Company had nothing to do with the foreclosure of either the Salmon mortgage or the mortgage which Clemson acquired from the City Institution for Savings, nor with any of the sales of property to Blendinger, or to the Bailey-Blendinger Manufacturing Company, did not participate in any way in said transactions or in the business carried on by said Bailey-Blendinger Manufacturing Company, nor derive any profit therefrom, excepting, however, that Bailey as an individual devised the entire plan of acquiring the parts of the property of Fowle Brothers and Company and of transferring one part to one corporation and another part to another corporation, and excepting that Clemson took such part in the matter as has been heretofore reported, and that Bailey and Clemson practically owned all of the stock of the company and caused it to be organized and that Clemson was an officer of the Clemson-Bailey Company, and Bailey was an officer in both of said corporations. If as a matter of law the corporations are to be charged with participation in the final fraud because all was done in conformity with Bailey's original scheme of fraud, then as a matter of law the corporation could not be said to have had nothing to do with the foreclosure, but in so far as it is a matter of fact, I find that the corporation (Clemson-Bailey Company), had nothing to do with the foreclosure of either mortgage.

" (c) The defendant Clemson had nothing to do with the organization of the Bailey-Blendinger Manufacturing Company, but he lent his aid to the foreclosure of the two mortgages, with the knowledge and purposes heretofore reported, and he received the proceeds of the foreclosure sales; he did not thereafter have any interest in the Bailey-Blendinger Manufacturing Company, nor in its property or the business it carried on, nor did he ever derive any profit therefrom.

" (d) The defendant Bailey-Blendinger Manufacturing Company, had nothing to do with the organization of the Clemson-Bailey Company, nor with any sales made to it by Bailey, nor with the business it carried on, and never participated in any of said transactions of the said Clemson-Bailey Company, nor in any of the profits of said Company, excepting, however, that Bailey as an individual devised the entire plan as set out in my first report, and it was a part of his plan to ultimately have two corporations, and he was an officer in both of such corporations.

" (e) Whether on the facts herein and heretofore reported, all the defendants are jointly liable is a question of law over which I have no jurisdiction. As a matter of fact I find that there was no further joint participation than as has been specifically reported."

The third report of the master was confirmed, and the cases were reserved by *Morton,* J., for determination by the full court.

Other facts are stated in the opinion.

*S. E. Qua,* for the plaintiff Lovejoy.

*G. C. Coit,* for the plaintiff Fowle.

*G. L. Mayberry, (G. W. Norris* with him,) for the defendants William C. Bailey and others.

*A. F. Converse,* for the defendant Julia A. Scalley.

SHELDON, J. These two suits in equity, although they have not been formally consolidated, arise out of the same transaction, have been heard together, and come before us upon a single reservation. And when we speak generally of the defendants in the first suit, we refer to the defendants other than Fowle.

1. The demurrer to Lovejoy's amended bill should be first considered.

The bill properly can be maintained for an accounting. By separate instruments, made by each partner with the knowledge and consent of the other, the plaintiff became entitled to receive

one half part of the profits of each partner and, upon the dissolution of the partnership, to one half part of the interest of each partner in all the firm property. And both partners covenanted with the plaintiff that the real estate described in the bill was and should remain a part of the partnership assets. This was enough to entitle the plaintiff to come into equity to have an account taken and the amount to which he was entitled ascertained. Neither the existence nor the extent of any money demand by him against either one of the partners could be ascertained until such an account had been taken. After the firm, though not actually dissolved, had ceased to do business and by the devices stated in the bill had stripped itself of the great bulk of its assets, the plaintiff would have been without remedy if he could not have brought such a bill as this. Whatever might have been his liability to firm creditors (*Fitch* v. *Harrington,* 13 Gray, 468), he was not as to members of the firm a partner. *London Assurance Co.* v. *Drennen,* 116 U. S. 461. *Ex parte Barrow,* 2 Rose, 252. *Bray* v. *Fromont,* 6 Madd. 5. But he was yet entitled to an accounting in order to determine his rights against each partner and to hold as against them their interests in the firm for the satisfaction of whatever sums should be found to be due to him. R. L. c. 159, § 3, cl. 7. *Chandler* v. *Chandler,* 4 Pick. 78. *Hallett* v. *Cumston,* 110 Mass. 32. *Noble* v. *Joseph Burnett Co.* 208 Mass. 75, 82. *Mathewson* v. *Clarke,* 6 How. 122. Even were this doctrine not so well established, yet the bill could be maintained under R. L. c. 159, § 3, cl. 6. The averments abundantly show the necessity of taking an account too complicated to "be conveniently and properly. adjusted and settled in an action at law." *Massachusetts General Hospital* v. *State Mutual Life Assurance Co.* 4 Gray, 227. *Pierce* v. *Equitable Life Assurance Association,* 145 Mass. 56.

We need not determine whether the plaintiff could have maintained a bill against each separate member of the firm upon the separate agreement with him without joining the other parties in interest, especially if he had sought only a declaration of his rights against each separate member. See *Settembre* v. *Putnam,* 30 Cal. 490; *Brown* v. *De Tastet,* Jac. 284. Under the circumstances now averred, with the same right relied upon against each partner, where it appears that the rights of the plaintiff against each partner have been recognized by both members of the firm, and

where as here one partner has absconded and the other has assumed control of all the business and property of the firm, and has so dealt therewith as to put it beyond the reach of the plaintiff unless such dealings can be avoided or disregarded, and where the other defendants have combined with that partner in a fraudulent endeavor to deprive the plaintiff of his contract rights against each partner, a bill brought to enforce those rights is not to be regarded as multifarious, because it recites the details of the fraudulent scheme and joins all the conspirators as parties defendant. The plaintiff upon the averments of the bill seeks to avoid the effects of one scheme of fraud, participated in by all the defendants except Fowle, who had absconded, and so could not act, but who is a necessary party to the bill. It would have been a needless and vexatious duplication of actions and of the resultant trouble and expense to all parties for the plaintiff to bring a separate bill upon each one of his separate agreements with the two partners, where, in order to secure the full relief to which upon the allegations of his bill he is entitled, he would have been compelled in each bill to join all the defendants and to seek upon the same grounds for the same relief that now is asked for. Here, as was the case in *Bliss* v. *Parks*, 175 Mass. 539, the bill seeks to enforce a general right with which all the matters charged are connected and to which all the parties are so related that they cannot be said to be unduly burdened by being joined in the same suit. As was said in that case, the objection of multifariousness is one as to which there is no inflexible rule, and the question must be determined largely by the circumstances of the particular case. Nor is it indispensable that all the parties to the bill should have an interest in all the matters complained of; it is enough if each party has an interest in some of the matters and they are connected with one another. See the cases collected in *Coram* v. *Davis*, 209 Mass. 229, 248, and *Ginn* v. *Almy*, 212 Mass. 486, 493.

Most of the cases relied on by the defendants rest upon different facts from those presented here, and are not applicable to this case. See for example *Keith* v. *Keith*, 143 Mass. 262; *Ricker* v. *Brooks*, 155 Mass. 400, 403; *Sylvester* v. *Boyd*, 166 Mass. 445; *Davis* v. *Peabody*, 170 Mass. 397; *Mesisco* v. *Giuliano*, 190 Mass. 352; *McLellan* v. *Osborne*, 51 Maine, 118; *Sawyer* v. *Noble*, 55 Maine, 227; *White* v. *White*, 5 Gill, 359; *Griffin* v. *Merrill*, 10 Md. 364.

The other causes of demurrer assigned have not been argued and could not be sustained. The decree overruling the demurrer must be affirmed.

2. Many of the defendants' exceptions to the master's first report deal with findings of fact made by him. Only a part of the evidence heard by the master has been reported; but the parties by a stipulation have agreed among other things that "there was evidence upon which the findings of fact made by the master might. be made." The defendants contend that the part of the evidence which has been reported shows that some of their exceptions to findings of fact should be sustained. We do not think so. We do not find so binding an admission by the plaintiff as has been contended for in argument, or any other testimony which might not have been met and controlled by unreported evidence. And the decision on *Lindenbaum* v. *New York, New Haven, & Hartford Railroad,* 197 Mass. 314, 323, that even uncontradicted evidence is not necessarily to be accepted as true, has been so often cited and followed that it is no longer to be argued against. The master had a right to find on proper evidence that Fowle's assumption of certain outstanding debts in his partnership agreement with Bailey was procured by the undue influence of Bailey, and so Bailey could not hold Fowle to its performance; and the stipulation of the parties which we have mentioned shows that there was such evidence. And the circumstances could very well be such that the rest of the agreement ought to stand, with the elimination of this obnoxious clause.

3. The thirty-second exception cannot be sustained. It is made immaterial as to the administratrix of Salmon by her subsequent appearance and answer and the fact that she is relieved from any claim by the special statute of limitations. R. L. c. 141, § 9. The liability of the other defendants is the same whether Salmon was an innocent tool or an active participant in the execution of this fraudulent device. The thirty-third exception is immaterial, for the master's report shows that Clemson bought and procured to be assigned to himself the mortgage held by the City Institution for Savings, and there was no contention that he paid for it less than the amount due thereon. And the desired finding, which though not material upon the main issue might have a bearing upon the account to be taken, was made by the master in his

second report. The charge is not that the confederates bought in this mortgage for less than its value, but that they acquired and used it for the purpose of carrying out an intended fraud which could not have been accomplished without first gaining control of the mortgage.

4. We see no ground of objection to the interlocutory decree entered on August 8, 1906, as amended on June 24, 1907, upon the master's first report and the exceptions taken thereto by the different parties. Its provision gave to the plaintiff Lovejoy nothing more than he was entitled to.

5. Upon the master's second report, certain exceptions of the plaintiff Lovejoy and of the defendant Fowle (who is the plaintiff in the second suit) were sustained. This was upon the ground that the master in his first report had found that the defendants Bailey, Clemson and Blendinger had participated in the fraudulent scheme set forth in the report, and had organized the two corporations, in which they alone were really interested, for the purpose of carrying out that fraudulent scheme. The single justice who entered that decree considered that on the findings the defendants became in equity joint tortfeasors and were liable jointly and severally for the wrongs in which they joined. Upon the facts then found and reported, we do not doubt that this was right. The mere fact, if it be so, that some of the defendants came into the scheme only after it had been formed and partly executed by Bailey, that the corporations for example may not have been organized until later, would not protect them from a joint and several liability with the earlier confederates, if they came into the scheme for the purpose of completing its accomplishment and of taking with full notice and knowledge the benefit of what wrongfully had been done. They would be liable alike for what preceded and what followed their accession to the combination. *Livermore* v. *Herschell*, 3 Pick. 33. *Adams* v. *Paige*, 7 Pick. 542. *Cheney* v. *Gleason*, 125 Mass. 166. *Boston* v. *Simmons*, 150 Mass. 461. *Emmons* v. *Alvord*, 177 Mass. 466. Nor do the additional findings of the master in his third report take the case out of the rule stated. They leave untouched the finding in the first report that "the foreclosure of the personal property mortgage and the sale thereof by Salmon, the mortgagee's sale of the real estate by Clemson, the sale of the personal property by Bailey in the name

of Fowle Brothers and Company, and the sales by Blendinger to the Bailey-Blendinger Manufacturing Company, were all made in pursuance of a fraudulent scheme by the aforesaid parties to defraud W. Frank Fowle and Elwyn W. Lovejoy, and that the intended sales were a mere pretence and cover to procure an apparent title to the property transferred." These findings are in no way reversed or modified in the third report. The additional finding there made went no further than to show that Clemson and Blendinger did not concern themselves about each other's wrongful gains, and that the same thing was true of the two corporations. But we do not consider it material that the different defendants took in severalty their respective shares of the booty resulting from their joint scheme. Nor upon the findings can the two corporations stand any better than the two individuals respectively interested in them. The Clemson-Bailey Company stands in the shoes of Clemson and Bailey; the Bailey-Blendinger Company in those of Bailey and Blendinger. Whether the corporations were organized at an earlier or a later period in the execution of the scheme is of no consequence. These defendants are jointly and severally liable.

6. But it is said that the suit against Clemson has fallen by reason of his death. If this were merely an action of tort for the consequences of a fraud, that might be so. *Houghton* v. *Butler*, 166 Mass. 547. *Jenks* v. *Hoag*, 179 Mass. 583. But that is not the case. Bailey stood in a fiduciary relation both to Fowle and to Lovejoy. The other defendants, taking the property which was the subject of that fiduciary relation from Bailey with notice of the rights of Fowle and of Lovejoy, gained no greater rights than those of their grantor. This is especially true where, as here, they all acted with a fraudulent intent to defraud Fowle and Lovejoy. Such a cause of action in equity survives the death of either of the parties. As in *Concha* v. *Murrieta*, 40 Ch. D. 543, the act complained of is not a mere tort, but it is a breach of a quasi contract, the claim being founded on the breach of a fiduciary relation, and the law implying a contract that a man will faithfully perform duties which he has undertaken. As in *Batty* v. *Greene*, 206 Mass. 561, the plaintiffs are really seeking to follow trust property or its avails procured by fraud and still held as part of the estate of the fraudulent party. And see, substantially

to the same effect, *Cheney* v. *Gleason*, 125 Mass. 166, 174; *Warren* v. *Para Rubber Shoe Co.* 166 Mass. 97, 104; *Wineburgh* v. *United States Steam & Street Railway Advertising Co.* 173 Mass. 60; *Parker* v. *Simpson*, 180 Mass. 334, 343. The Orange County Trust Company, as executor of the will of Clemson, must be held liable to these plaintiffs, and a proper decree must be entered against it. *Von Arnim* v. *American Tube Works*, 188 Mass. 515, 521.

7. The defendants' twenty-sixth exception to the master's second report rightly was sustained. As the Bailey-Blendinger Company is held to pay rental, this item must be allowed as a charge in diminution of its net profits. Otherwise, it would be doubly charged with rent.

8. As to the mortgage for $5,000 which was assigned to Clemson and foreclosed by him in the manner reported by the master, it is contended by the defendants that the amount thereof should be allowed to them in the accounting. So far as this claim rests upon any right of the defendants to be subrogated to the benefit of the incumbrance which they have paid by means of a foreclosure, their contention cannot be allowed. What they did was done in furtherance of their fraud as an essential part of their wrongful purpose. They acted in their own wrong; they do not come into court with clean hands, and cannot now invoke the equitable doctrine of subrogation to relieve them from the consequences of their tortious acts. *Railroad Co.* v. *Soutter*, 13 Wall. 517. *Sands* v. *Codwise*, 4 Johns. 536, 598. *Gillespie* v. *Moon*, 2 Johns. Ch. 585, 602. *Guckenheimer* v. *Angevine*, 81 N. Y. 394. *McCaskey* v. *Graff*, 23 Penn. St. 321. *Hays' estate*, 159 Penn. St. 381. *Almond* v. *Wilson*, 75 Va. 613. *White* v. *Trotter*, 14 Sm. & M. 30. *Connecticut Mutual Life Ins. Co.* v. *Smith*, 117 Mo. 261, 297, 298. *Goble* v. *O'Connor*, 43 Neb. 49. *Johnson* v. *Moore*, 33 Kans. 90. But this well settled principle is not applicable. The note, though signed by Fowle and not by the firm, was a charge upon the firm's real estate, and, through the Salmon mortgage, upon much of its personal property. It may be doubted whether, under the partnership agreement between Fowle and Bailey, with the elimination of the clause which as we have seen is to be disregarded, this note had not become a firm debt. At any rate, it was substantially so. If it had been paid by the firm in good faith, in the regular course of business, this would have been a proper expenditure of

the partnership funds, and could not have been charged by the firm to Fowle's private account. In effect, the note has been paid. As this was the payment of a firm debt, the defendants must be credited with it as such. But this allowance of course cannot diminish the profits of the old firm. It was like an old debt of the firm; its payment is like the payment of any such debt.

9. The amounts paid for taxes upon real estate and machinery should be allowed as an offset against rent and depreciation. The account is taken as if the real estate and machinery had been leased to the Bailey-Blendinger Company; and in such case the taxes, in the absence of any agreement on the subject, would have fallen upon the general owners of the property. R. L. c. 12, § 20. *Walker* v. *Whittemore,* 112 Mass. 187, 189. *Boston Molasses Co.* v. *Commonwealth,* 193 Mass. 387, 391. But the amounts paid by the defendants for insurance premiums should not be allowed to them. Their policies were taken for their own benefit, and would not have been available to either of these plaintiffs. Nor are the defendants' expenditures for repairs to be allowed to them. Repairs made by tenants are not chargeable to the general owner.

10. The salaries paid to the officers of the two corporations must be treated as if the corporations had not been formed, but the individual defendants had carried on the business directly and in their own names instead of doing so indirectly and under the shelter of the corporate organizations. If that had been so, it would have been for the court to say as a matter of discretion whether anything or how much should be allowed as compensation for their services. *Robinson* v. *Simmons,* 146 Mass. 167. *Moore* v. *Rawson,* 185 Mass. 264, 276, and 199 Mass. 493, 502. In these cases, the defendants, whose conduct was wholly wrong, should be allowed no compensation for services in continuing the old business. But the business of the corporations was not wholly that of the old firm. The salaries in question were not themselves fraudulent and excessive, and were paid for the management of other property and capital mingled with those of the old firm. Something properly may be allowed for this reason. We think it fair under the circumstances to allow one half of the amounts paid for these salaries and no more. Bailey must, however, be charged with the amounts drawn by him from the old firm while managing its business, being $30 a week or thereabouts. It does not appear that this was an

agreed allowance to him for services; and it must be taken to have been received by him merely as a partner.

11. The sum of $3,355.35, being profit received by Bailey on the sale of his stock in the Clemson-Bailey Company, should be charged against him. It was a profit made by him in dealing with the firm property and its proceeds. And under the rule to be applied in these cases this proper charge against Bailey is also a proper charge against all the defendants other than Fowle, just as they all become liable to Lovejoy for the amount which originally he could have recovered only from Fowle, — all of them being held by reason of their combination in the scheme to prevent the plaintiff from obtaining what was due to him from each of the two members of the original firm.

12. As already has been said, the cause of action against the defendant Scalley as administratrix of the estate of Salmon is barred by statute and the bill must be dismissed as to her.

13. The claims allowed by the receiver should be paid by him out of the balance in his hands if that balance is sufficient therefor. The claim made by Clemson's executor for $5,000 must be disallowed; but as this is to be considered in the general accounting, it is not perceived that his estate suffers by the disallowance. The claim made by Blendinger must be disallowed. So far as he is entitled to any allowance, it will be made in the accounting as already stated.

14. The good will of the business of the old firm was properly charged against the defendants.

15. The assets of the old firm must of course be taken to include the notes of Fowle and Bailey, amounting to about $6,500 due from each of them. This has not been disputed.

16. We do not think it necessary to discuss the other questions that have been argued, except to say that we do not allow to either plaintiff both interest and profits upon the same amounts for the same time. This of course should not be done. None of the contentions made by either party in argument which have not been allowed is sustained.

17. Since the account is taken as of August 8, 1906, each plaintiff is entitled to interest from that date upon the amount found due to him. Counsel have not fully argued the question what these respective amounts should be, and we think it better to leave that

point to be settled by a single justice, or if necessary, by the master. In the first case, the plaintiff Lovejoy is entitled to a decree against the defendant Fowle for the amount due from that defendant, with interest as aforesaid, but without costs; and against all the other defendants except Scalley and the Orange County Trust Company for the total amount due him from both Fowle and Bailey, with interest as aforesaid, and costs. Against the Orange County Trust Company he is to have a decree for costs, and also a decree for the total amount last mentioned, with interest as aforesaid, to be paid out of the goods and estate of Clemson in his hands. But he is to have only one full satisfaction from all the decrees and any amount that may be available to him from the fund in the hands of the receiver is to be credited upon his decrees. As to the defendant Scalley, the bill is to be dismissed with costs.

In the second case, the plaintiff Fowle is to have a decree against the defendants (except the defendant Scalley, as to whom the bill is to be dismissed with costs) for the amount found due to him, after allowing for the notes due from him and from Bailey to the old firm of Fowle Brothers and Company, with costs.

As the demand of Parker has been allowed and is to be paid accordingly, his intervening petition is to be dismissed without prejudice, unless it shall appear that the fund in the hands of the receiver is insufficient to meet his demand. In that event, he is to have decrees against the defendants in the first case for any balance due him, like those of the plaintiff Lovejoy. And the receiver is to be ordered, after payment of his proper costs and charges, to pay the amount of the approved claims of Parker, of John L. Fowle, and of the Clemson-Bailey Company, in full or ratably, as the amount in his hands may or may not be sufficient therefor, and to pay any balance that may remain to the plaintiff Lovejoy, to be credited on the total amount to which he is entitled as aforesaid.

*So ordered.*