1160

CLAIRE GIANNINI HOFFMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ESTATE OF VIRGIL D. GIANNINI, DECEASED, A. P. GIANNINI, ADMINISTRATOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

LAWRENCE M. GIANNINI, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MERCEDES A. GIANNINI, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 108314, 110341, 110003, 110004. Promulgated December 20, 1943.

*George H. Koster, Esq.*, for the petitioners.
*Thomas M. Mather, Esq.*, for the respondent.

MELLOTT, *Judge*: These consolidated proceedings involve the following deficiencies in tax:

| Docket No. | Year | Kind of tax | Deficiency |
| --- | --- | --- | --- |
| 108314 | 1938 | Income | $2,615.25 |
| 110341 | 1938 | Estate | 26,740.33 |
| 110003 | 1938 | Gift | 3,917.46 |
| 110004 | 1938 | Gift | 202.91 |

They were submitted upon a lengthy stipulation of facts, including some 70 documents attached as exhibits, and the testimony of six witnesses. All of the facts shown by the stipulation and the exhibits are hereby found, whether hereinafter set out or not. Additional findings, based upon the evidence adduced at the hearing, will be made preceding discussion of the various issues; and, in so far as they may be applicable to any of the issues, will be considered though not repeated.

The principal issues in the three proceedings first mentioned have their genesis in an investment made by Virgil D. Giannini (hereinafter referred to as Virgil) under the circumstances shown in the stipulation. Virgil died intestate on April 28, 1938. His brother, Lawrence M. Giannini (hereinafter referred to as Lawrence) was determined by the respondent to have made a gift, of property which he acquired by reason of the death of Virgil, to his sister Claire Gian-

nini Hoffman (hereinafter referred to as Claire). Stated generally,[1] the principal issues in the three cases are: In Virgil's Estate—What was the value, if any, of the property or property right represented by an investment in a securities business, which passed by his death? In Lawrence's case—Did the assignment to his sister Claire of the right or option to purchase, upon the death of Virgil, all the rights and interests in a securities business which Virgil then had, constitute a gift to her and, if so, what was its value? In Clair's case— Did the respondent err in computing the income which she realized as a result of, and following, the assignment by Lawrence?

One other issue is raised in the proceeding instituted by Virgil's Estate—Did respondent err in including in gross estate the value of property transferred to a trust? The last proceeding requires determination of but one question: If the assignment made by Lawrence constituted a gift to his sister, then should one-half of the value thereof be taxed as a gift made by his wife? In other words, was the gift of separate, or was it of community, property?

We summarize the stipulated facts upon which the principal issues are largely based.

In the early part of 1931 Vernon C. Walston, who had been employed by Intercoast Trading Co. as a securities trader, during which time Lawrence M. Giannini was his senior officer, approached Lawrence for the purpose of obtaining financial backing so that he might establish his own securities business. Lawrence suggested that he talk to Charles de Y. Elkus, a member of the law partnership of Bacigalupi, Elkus & Salinger, which firm had from time to time represented the Giannini family. Pursuant to this suggestion, Walston conferred with Elkus and obtained the requested financing. A securities business bearing the name Vernon C. Walston was established with a capital of $26,000. The capital consisted of $1,600 of Walston's personal funds and $24,400 transferred to him on a promissory note drawn by him payable to Elkus. The money transferred by Elkus to Walston had been secured from Lawrence, and was paid by checks of A. P. Giannini Company, Inc. This company was the family corporation with which various members of the Giannini family maintained credit balances.

On November 1, 1932, Lawrence transferred whatever interest he had in Walston's business to Virgil, the latter, on that date delivering to Lawrence a demand note in the amount of $24,400 payable to Bank of America National Trust & Savings Association, trustee under a trust created by Lawrence April 4, 1929.

In the latter part of 1932 Walston, Charles J. Smith, and Sherman Hoelscher considered the formation of a partnership to take over and

---

[1] The issues as framed by the pleadings and as discussed by the parties will be set out fully later.

expand Walston's security business. Their plans required additional capital which they did not have   Walston arranged with Elkus for the necessary financing.   A partnership agreement was entered into on December 17, 1932, under the limited partnership laws of the State of California, Walston, Smith, and Hoelscher being general partners and Elkus a limited partner.   Walston contributed $15,600, Smith $4,680, Hoelscher $5,200, and Elkus $26,520.   Each of the partners was to receive a sum equal to 6 percent per annum on the amount of his investment in the partnership, the interest of the limited partner to be a first charge on all profits.   Each of the partners was to receive as the balance of his share of the profits of the partnership a percentage of the net profits as follows:

| Walston | 30 percent |
|---------|------------|
| Hoelscher | 10 percent |
| Smith | 9 percent |
| Elkus | 51 percent |

On December 17, 1932, the following transactions occurred:

Walston, Smith, and Hoelscher borrowed part of their required additional capital from Elkus, and gave their promissory notes therefor.   Each gave an option to T. J. Bacigalupi and H. H. Salinger, trustees (hereinafter sometimes referred to as the trustees), to purchase a specified portion of his respective interest in the partnership, to be exercised at any time by delivery of written notice by the trustees of their intention to do so, upon the payment of the balance due upon the Elkus notes.   Elkus assigned the notes to Virgil and the trustees assigned all of their right. title, and interest in the three agreements to Virgil.   Elkus and the trustees entered into an agreement with Virgil in which they acknowledged that the money loaned to Walston, Smith, and Hoelscher had been secured from Virgil and that in entering into such agreements and in making such loans they were acting for and on behalf of Virgil.   The agreement further recited that in investing in the partnership of Walston & Co. the sum of $26,520 Elkus was acting for Virgil and for his account as an accommodation to him.

On the same date Virgil executed the following document, which he delivered to his brother, Lawrence.

Reference is made to that certain agreement dated the 17th day of December, 1932 by and between V. C. Walston, C. J. Smith and Sherman Hoelscher as General Partners, and Charles de Y. Elkus as Limited Partner, and to all supplemental agreements, letter or letters made and entered into concurrently with or subsequent to the execution of said agreement and in connection therewith, and to loans made by the said Charles de Y. Elkus to each of the said General Partners and which loans are evidenced by promissory notes bearing date the 17th day of December, 1932, and option agreements dated the 17th day of December, 1932 from each and said General Partners to T. J. Bacigalupi and H. H. Salinger, Trustees.

For and in consideration of the sum of Ten ($10.00) Dollars, receipt of which is hereby acknowledged, and other valuable consideration, the undersigned, V. D. Giannini does hereby extend to L. M. Giannini an option to be exercised only upon the death of the said V. D. Giannini, to purchase all of the right, title and interest which the said V. D. Giannini may then have in the said agreement hereinabove referred to, and all said supplemental agreements, letter or letters, and said loans and said options, and in the business of "Walston & Co.", which business was entered into by the partners pursuant to the terms of said agreement.

The undersigned, V. D. Giannini, does hereby agree to sell to the said L. M. Giannini all of the said property and rights hereinabove referred to, and to accept in payment therefor the cancellation as fully paid of all moneys then due on the promissory note dated the first day of November, 1932 executed by the undersigned and payable to the Bank of America N. T. & S. A., Trustee, in the principal amount of Twenty Four Thousand Four Hundred and no/100 ($24,400.00) Dollars, and the payment to my estate of a sum equal to the value at the time of my death of a twenty (20%) percent interest in the said business of "Walston & Co." and in determining the value of said interest, all assets and liabilities, including all stock exchange memberships, are to be figured at their current market value on the date of my said death, and no allowance is to be made for "going business value" or "good will".

This option shall remain in full force and effect until the time of my death unless the written consent of L. M. Giannini is obtained to the cancelling of the same, and shall bind the undersigned, his heirs, executors, administrators, and assigns, and inure to the benefit of the said L. M. Giannini, his heirs, executors, administrators, and assigns.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of December, 1932.

[Signed]    V. D. GIANNINI.

The partnership of Walston & Co. operated under the original agreement until January 1, 1936, when C. P. Hoffman became a partner. At this time the articles of the partnership were amended to provide that $10,400 of Elkus' capital contribution and 20 percent out of Elkus' 51 percent interest in the firm should be transferred to Hoffman. For this transfer Hoffman gave Elkus $4,000 in cash and a note for $10,341. Elkus immediately transferred the cash and note to Virgil. When Hoffman signed the note he also executed an option agreement with the trustees, who were acting for Virgil, authorizing them to purchase his 20 percent interest in Walston & Co. for the value of the interest at the time of the exercise of the option, such value to be determined in the manner prescribed in the agreement.

On the same date, i. e., January 1, 1936, Virgil executed an amendment to the agreement which he had given to Lawrence, set out above, reflecting the changes in his interest in Walston & Co. occasioned by the transactions of January 1, 1936, and including therein the loan and option agreements of that date with the same force and effect as if they had been incorporated in the original agreement.

In 1937 the partnership of Walston & Co. decided to acquire a seat on the New York Stock Exchange and to increase its capital for that purpose. On December 2, 1937, new articles of co-partnership were drawn, which provided for the necessary capital investment of the partners. These articles were supplemented on February 28, 1938, the new articles being effective for the entire year 1938, under which the partners' capital contributions were to be as follows:

|  | Amount | Percent |
|---|---|---|
| C. P. Hoffman | $125,000 | 50 |
| V. C. Walston | 37,500 | 15 |
| Sherman Hoelscher | 12,500 | 5 |
| C. J. Smith | 12,500 | 5 |
| Chas. de Y. Elkus, Ltd., partner | 62,500 | 25 |
| Total | 250,000 | 100 |

The agreement provided that the partners should receive each month a sum equal to 6 percent per annum on their respective investments in the partnership and that they should share the net earnings on the percentage basis shown above.

In order to make the additional contribution to the partnership and to pay off his note to Elkus for $10,341, C. P. Hoffman borrowed from his wife Claire, sister of Lawrence and Virgil, the sum of $123,000. This loan was evidenced by two notes dated February 28 1938, one for $75,000 and one for $48,000. Claire had borrowed the money which she had loaned to her husband from her brother Virgil and had given him two promissory notes dated February 28, 1938, in the amount of $75,000 and $48,000, respectively signed by her. As security for the payment of her notes she gave Virgil the two notes of her husband and executed an agreement pledging them. On the same day Virgil wrote Claire a letter, acknowledging her agreement pledging the notes of her husband as security for her notes and agreeing to limit her liability on her promissory notes to him to such recovery as he might be able to make on Hoffman's notes.

On March 9, 1938, Hoffman executed an option agreement with Bacigalupi and Salinger to purchase a 20 percent interest in Walston & Co. ("being 40 percent of my said interest in the partnership") by the payment to him of the value of such interest on the date of the delivery of the notice and providing that payment for such interest, in whole or in part, could be made by assuming all of the then existing liability under his promissory note to his wife in the amount of $48,000, the amount so assumed to be credited on the purchase price. At the same time Hoffman extended to Bacigalupi and Salinger, trustees, the option to purchase the balance of his interest in the partnership of Walston & Co., i. e., 30 percent interest, agreeing to accept as payment

for this 30 percent interest the sum of $75,000 to be paid by "you assuming all of my then liability under said promissory note from myself to Claire Hoffman in the principal amount of $75,000." The agreement also provided that from the date thereof Bacigalupi and Salinger would receive all interest paid by the partnership on the unpaid balance of $75,000 and all profits from the 30 percent interest in the partnership until the note was fully paid, and that they would save Hoffman clear from all losses arising out of such 30 percent interest.

On the same date March 9, 1938, Bacigalupi and Salinger assigned to Virgil all of their right, title, and interest in the option of March 9, 1938, from Hoffman and all of their interest, if any, in the two promissory notes in the amounts of $75,000 and $48,000, respectively, dated February 28, 1938, and payable to Claire G. Hoffman. On the same date Elkus, Bacigalupi, and Salinger executed an agreement with Virgil, which stated, among other things, that in entering into the option agreement with Hoffman and in all things which they had done or might thereafter do in connection with the business of Walston & Co., they were acting solely for Virgil and that they had no interest whatever in the transaction with Hoffman or in the partnership of Walston & Co., but were acting as an accommodation to Virgil. Virgil agreed to hold them free from any liability whatever in connection with the transaction, if not occasioned by their own willful malfeasance. On the same date Virgil executed an amendment to the document given to his brother Lawrence on December 17, 1932, set out above. This amendment was made to reflect the changes in his interest in Walston & Co. occasioned by the transactions of February 28, 1938, and March 9, 1938. None of the options granted by Hoffman to, or for the benefit of, Virgil was ever exercised.

The partnership of Walston & Co. followed the practice of distributing to Elkus, at the end of each year, his portion of the year's profits, whereupon he would transfer the profits to Virgil. Walston & Co. maintained capital accounts on its books and records for the partners named in the partnership agreements. The only entries in these accounts during the period 1936 to 1938 were entries which gave effect to readjustments of interest against the named partners, as reflected by the partnership agreements. During 1938 the books showed the partners and the capital accounts to be as follows:

| | |
|---|---|
| Walston | $37,500 |
| Hoelscher | 12,500 |
| Smith | 12,500 |
| Hoffman | 125,000 |
| Elkus | 62,500 |
| Total capital | 250,000 |

The net income of Walston & Co. as disclosed by its books for the years 1933 to 1939, inclusive, after deduction of interest on capital at the rate of 6 percent per annum, was as follows:

| | |
|---|---|
| 1933 | $70, 477. 44 |
| 1934 | 10, 875. 30 |
| 1935 | 127, 964. 54 |
| 1936 | 83, 376. 54 |
| 1937 | 10, 213. 56 |
| 1938 | 10, 003. 38 |
| 1939 _____loss__ | (16. 402. 79) |

Walston & Co. continued in business without interruption under the various agreements heretofore shown until September 10, 1940, when its registration under the Securities Exchange Act of 1934, as amended, was revoked. (A copy of the findings and opinion of the Securities and Exchange Commission is shown as Exhibit 52 attached to the stipulation.)

## ISSUE I.

### Additional Facts Particularly Applicable to Claire G. Hoffman's Income Tax Liability for 1938 (Docket No. 108314).

Petitioner Claire G. Hoffman is an individual residing at San Mateo, California. She filed her income tax return for the year 1938 under the name of Mrs. C. P. Hoffman with the collector of internal revenue for the first district of California at San Francisco, California, and paid the tax shown to be due within three years prior to the filing of the petition in this proceeding. Her return was prepared and filed on the cash receipts and disbursements basis. During the taxable year 1938 she was married and living with her husband, C. P. Hoffman.

Upon the death of Virgil on April 28, 1938, Lawrence, under the agreement of December 17, 1932, as amended, became entitled to acquire Virgil's interest in Walston & Co. and in the notes, agreements, and options held by Virgil at the date of his death, upon the payment of the balance due on the $24,400 promissory note dated November 1, 1932, payable to the trust created by Lawrence, and the payment of a sum equal to the value at the time of Virgil's death of a 20 percent interest in the business of Walston & Co. At that time there was an unpaid balance of $4,400 due on the note. The parties in interest determined that as of that date a 20 percent interest in Walston & Co. had a value of $40,529.91. The adjusted net worth of the firm was determined to be $202,649.55 after a write-down in debts of $2,000 and a write-down of $25,470.90 of Stock Exchange seats to their current market value.

Following the death of Virgil, Lawrence, by an instrument dated May 31, 1938, in which the consideration was stated to be $10, assigned all of his right, title and interest under the agreement of December 17, 1932 (as amended), to Claire. Immediately upon the receipt of the assignment Claire exercised the rights given under the amended agreement, made payment to the estate of Virgil of $40,529.91 cash, and assumed payment of the $4,400 due to Lawrence on the $24,400 note. She thereby acquired the following:

1. The right to receive from Elkus whatever he might receive from Walston & Co. on his 25 percent partnership interest in Walston & Co.

2. The Hoffman note in the amount of $75,000, and the option extended by Hoffman to Bacigalupi & Salinger under which Bacigalupi & Salinger were to receive all interest paid by the partnership on the sum of $75,000, or the unpaid balance thereof, and all profits from the 30 percent interest of Hoffman in the partnership.

3. The Hoffman $48,000 note upon which $47,000 was unpaid and the option extended by Hoffman to Bacigalupi & Salinger, trustees, regarding Hoffman's 20 percent partnership interest in Walston & Co.

On May 31, 1938, Claire, Elkus, Bacigalupi and Salinger entered into an agreement reciting that Claire had acquired the interest in Walston & Co. formerly held by Virgil and that Elkus, Bacigalupi, and Salinger, who had theretofore acted for and on behalf of Virgil in all matters relating to loans, agreements, and options in connection with Walston & Co. would thereafter act for and on behalf of Claire. This agreement recited that the sum of $62,500 invested in the partnership "is now the money of" Claire and that Elkus had no interest whatever in the transaction with Walston & Co. or its partners, but had acted, and was acting, as an accommodation to Virgil and Claire respectively. Claire agreed to Hold Elkus, Bacigalupi, and Salinger free from any liability in connection with such transactions unless arising out of their willful malfeasance. On the same date Bacigalupi and Salinger assigned to Claire the agreement executed by her husband, Hoffman, on March 9, 1938, and the two promissory notes of $75,000 and $48,000 signed by Hoffman and payable to his wife Claire. The balance due on the notes at that time was $75,000 and $47,000 respectively.

The total net income of Walston & Co. for the calendar year 1938 (including an adjustment of $384.27 made by respondent and conceded by the partnership) was $40,267.65, consisting of:

| | |
|---|---:|
| Ordinary income | $37,774.60 |
| Long term loss | (9,020.17) |
| Short term gain | 11,513.22 |
| Total | 40,267.65 |

The long term loss resulted from a seat on the San Francisco Curb Exchange, which had been acquired by Walston & Co. on December 19, 1932, at a cost of $11,990.45. The exchange was disbanded in 1938.

On May 16, 1938, Walston & Co. received $2,500 as a preliminary distribution and on June 27, 1938, $470.28 as a final distribution, or a total of $2,970.28. On its partnership return of income for 1938 Walston & Co. reported the capital loss of $9,020.17, claiming 50 percent thereof, or $4,510.09 as a capital loss. The short term gain of $11,513.22 is the difference between capital gains realized by Walston & Co. after June 1, 1938, and before December 31, 1938, amounting to $17,784.95, and capital losses aggregating $6,271.73, sustained by the partnership between January 1, 1938, and May 31, 1938.

The active partners (Walston, Hoelscher, Smith, and Hoffman) drew salaries during 1938 aggregating $14,880. The amount payable as interest on capital (6 percent on $250,000) was $15,000 for the calendar year 1938. The Commissioner determined that Claire acquired an interest in Walston & Co. by purchase on May 31, 1938, for $44.929.21 and that she, for income tax purposes, must be considered to have been a joint venturer in the securities business after that date. He therefore divided the partnership earnings and losses of Walston & Co. into two periods for the purpose of computing her income from that source as indicated below.

|  | Jan. 1 to May 31 1938 | June 1 to Dec 31, 1938 |
| --- | --- | --- |
| Salaries of partners | $6, 250. 00 | $8, 630. 00 |
| Interest on capital | 6, 200. 00 | 8, 800. 00 |
| Other income or (loss) | (15, 411. 21) | 23, 305. 81 |
| Total ordinary income | (2, 961 21) | 40, 735. 81 |
| Capital gains and (losses) short term, 100 percent reportable | (6, 271. 73) | 17, 784. 95 |
| Capital gains and (losses) long term 50 percent reportable | (4, 510. 09) | None |

Petitioner, in filing her income tax return for the calendar year 1938, included in her gross income the amount which she determined was received (or receivable) from the partnership on the basis of its books during the period after the date of Virgil's death. In other words, she included in her gross income eight-twelfths of the total net income of the partnership for the calendar year 1938 and the same proportion of the capital gains and losses. This included $2,520.92 received from Elkus and $3,025.10 received from Bacigalupi and Salinger under the trust agreements referred to above, being interest on 55 percent of the total capital investment (25 percent on the capital carried in Elkus' name—$62,500—and 30 percent on the $75,000 represented by the Hoffman note). She also included $1,914.81 received by her from her husband as interest on his $47,000 note. The Commissioner reduced the aggregate of the two first mentioned amounts ($5,546.02) to $4,812.50, explaining that there should have been included in her income from this source but $4,812.50 or 6 percent on $137,500 for 7 months. A similar adjustment was made reducing the

interest income from her husband on his $47,000 note from $1,914.81 to $1,645.00.

The net distributable profits of Walston & Co. for 1938 in the total amount of $10,003.38 [2] were distributed to the partners on January 1, 1939, as follows:

| | |
|---|---|
| Walston | $1,500.51 |
| Hoelscher | 500.17 |
| Smith | 500.17 |
| Hoffman | 5,001.69 |
| Elkus | 2,500.84 |
| | [2] 10,003.38 |

Claire included in her gross income, in addition to amounts not now in issue and in addition to the interest on the capital investment referred to above, the 30 percent portion of the Walston & Co. profits distributable to Hoffman and payable to Bacigalupi and Salinger, the portion distributable to Elkus, and a community property one-half interest in the portion distributable to her husband, Hoffman. She now contends that she erred in including any amount in connection with the Elkus and Bacigalupi and Salinger portions "because she did not receive them until 1939."

The Commissioner determined that Claire should have included in her gross income one-half of the salary ($3,600) received by her husband from Walston & Co. or $1,800 and one-half of the interest ($3,000) received by him upon his capital investment in Walston & Co. or $1,500, the income of the spouses being reported on a community basis. These adjustments are not in issue. He also determined that she should have included in her community income one-half of the 20 percent of the net profits realized by her husband from Walston & Co. during 1938 or $789.46. The net result of all the adjustments made by the respondent was an increase in Claire's ordinary income from $13,727.73 to $21,720.91, an increase in short term capital gains from $7,483.59 to $10,933.04, and a reduction in long term capital losses from $2,941.54 to $451.01. (The $451.01 just referred to is one-half, or her community share, of her husband's portion—20 percent—of the long term capital loss of the partnership.)

OPINION.

The adjustments made by the respondent indicate his basic theory— that for income tax purposes Claire was a joint venturer in the securities business from and after the assignment of Virgil's interest in Walston & Co. to her (May 31, 1938) and therefore taxable as a

---

[2] The amount should apparently be increased by $384.27, but the correction is unimportant in the view which we take of the issues.

partner.[3]   If this theory is sound then the deficiency in tax is correct.

Petitioner assails the deficiency upon several grounds, some of which are in the alternative.   The Securities and Exchange Commission held, in its opinion of August 8, 1940, that Virgil's agreement had not resulted in Virgil "becoming a substituted limited partner in Walston & Co. in place of Elkus" citing sections 2495 and 2501 of the California Civil Code.   Pointing to this holding, petitioner argues: "Since there was no change in the * * * organization or partnership agreement * * * it should follow that * * * [she] was not a partner."   She also cites sections of the California statutes, particularly those relating to limited partnerships, and contends that she (and Virgil before her) was but a "sub-partner" with Elkus, the essence of her agreement with him being that she was given "only a derivative interest" in the firm's profits, which became effective only after Elkus received his income from Walston & Co.   As to the Hoffman 30 percent and 20 percent interests she argues she merely held promissory notes, secured by an option agreement under which she received income "in the nature of interest * * * taxable to her only as she receives it."   Finally she urges that since she reports her income on a cash basis she can be taxed in 1938 only upon the income actually received by her in that year.   In the alternative she argues that even if she is taxable as a partner "her interest could not be any greater than that which Virgil had, and at most that interest was nothing more than the right to obtain from Elkus, and perhaps from Hoffman with respect to his 30 percent interest, the amount of profits which Walston & Co. had at the end of its accounting period * * *."   She insists that it was improper for the respondent, under any possible theory, "to change the accounting basis of the partnership to determine the profits distributable to her"; [4] but if any change is to be made then she argues, as a further alternative, that it should

[3] Revenue Act of 1938:

"SEC. 901. DEFINITIONS.

   "(a)  When used in this Act—

   *        *        *        *        *        *        *

   "(3)  The term 'partnership' includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this Act, a trust or estate or a corporation; and the term 'partner' includes a member in such a syndicate, group, pool, joint venture, or organization."

   *        *        *        *        *        *        *

"SEC. 182. TAX OF PARTNERS.

   In computing the net income of each partner, he shall include, whether or not distribution is made to him—

   (a)  As a part of his short-term capital gains or losses, his distributive share of the net short-term capital gain or loss of the partnership.

   (b)  As a part of his long-term capital gains or losses, his distributive share of the net long-term capital gain or loss of the partnership.

   (c)  His distributave share of the ordinary net income or the ordinary net loss of the partnership, computed as provided in section 183 (b)."

[4] The quotations in this paragraph are from petitioner's brief.

be effective from the date of Virgil's death 'rather than from the date of the assignment.

It is true that Walston & Co. was a limited partnership under the laws of California and, for present purposes, it may be assumed that the Securities and Exchange Commission correctly concluded, for the purposes before it, that Virgil's agreement with Elkus and the trustees did not make him a substituted limited partner in place of Elkus or a substituted general partner in place of the trustees or of Hoffman for whom they acted. The Commission held, however, that Virgil was in control of the partnership since he, as the result of the various agreements, "could acquire all or any part of the business, expel all or any of the partners, or force the complete liquidation of the assets of the firm." Since Claire succeeded to all of his rights it would seem to follow that she, after May 31, 1938, was in the same position. However that may be, it is clear she had an economic interest to the extent of 55 percent, Elkus being merely her nominee as to 25 percent and the trustees being in substantially the same status as to an additional 30 percent. As we interpret the various documents this was a 55 percent interest in all of the assets and property of the partnership on May 31, 1938. and not, as petitioner contends, merely a 55 percent interest in the net earnings of Walston & Co. at the end of its accounting period, i. e., December 31, 1938.

Petitioner is correct in her contention that debtor-creditor relations between members of a partnership and third persons do not make the creditor a member of the partnership. Cases so holding are legion, a few of which are shown in the footnote.[5] Nor does an assignee of an aliquot part of a partner's income from a partnership become a member of the partnership, even though he may have agreed to make good to the assignor the same aliquot part of the losses he might sustain by reason of his membership in the firm. *Burnet* v. *Leininger*, 285 U. S. 136. If a creditor holds himself out as a partner he may incur liability as such, *Associated Piping & Engineering Co.* v. *Jones*, 17 Cal. App. (2d) 107; 61 Pac. (2d) 536; and where his contract and the surrounding circumstances show him to be in fact a joint venturer, contributing to the capital and sharing in the profits and losses, he may be adjudged to be a partner even though the contract with his co-adventurers specifically provides otherwise. *San Joaquin Light & Power Corp.* v. *Costaloupes* (Cal.), 274 Pac. 84.

The distinction between a creditor of a firm and a member of it is of course so pronounced and well settled as to need no discussion, though cases involving a somewhat related question—whether what appears

---

[5] *Lovejoy* v. *Bailey*, 214 Mass. 134 ; 101 N. E. 63 ; *Henry* v. *Evans*, 95 Iowa 244 ; 63 N. W. 687 ; *Quadrangle Petroleum Co.* v. *Kendrick & Eason Lumber Co.*, 120 Okla. 246 ; 249 Pac. 910 ; *Nirdlinger* v. *Bernheimer*, 133 N. Y. 45 ; 30 N. E. 561 ; *Winston* v. *Hoyne*, 277 Fed. 668 ; *London Assurance Co.* v. *Drennen*, 116 U. S. 461 ; *Giles* v. *Vette*, 263 U. S. 553.

to be stock is but evidence of an indebtedness—have given appellate courts and this tribunal some difficulty. Cf. *Pacific Southwest Realty Co.* v. *Commissioner*, 128 Fed. (2d) 815; certiorari denied, 317 U. S. 663; affirming 45 B. T. A. 426. The question of intent, if not the touchstone, is at least a fairly reliable guide. We therefore inquire, Did petitioner intend to invest her money in the securities business, to contribute to its capital and share in its gains and losses, or did she intend to lend her money to it and thereby become only a creditor? Some assistance in determining the answer to the question as posed may be secured by examining the intent of Virgil.

The Securities and Exchange Commission, having before it the documents and agreements now in evidence, concluded that Virgil "wished to control a brokerage firm and also to keep such control secret." Analyzing the agreements which were in effect for the period from December 17, 1932, to January 1, 1936, it concluded that Virgil's actual participation in the profits through Elkus and the trustees was 90 percent. After his brother-in-law was taken into the firm his participation was less; but it is perfectly clear that he had no illusions with reference to his rights, for he continued to receive a major portion of the profits. While some of the transactions were caused to assume the guise of loans, it is doubtful if any loan was ever made or intended to be made in connection with the $75,000 note. Looking at actualities Virgil advanced $75,000 to his brother-in-law through his sister, wife of the so-called borrower. The brother-in-law immediately gave Virgil's "trustees" the option to "purchase" his 30 percent interest, acquired for $75,000, agreeing to accept as the purchase price thereof cancellation of the $75,000 note. This was the essence of the agreement. The trustees, recognizing and acknowledging that the "moneys so loaned were the moneys of Virgil" and that "the unpaid balance thereof has been acquired by" Claire, immediately upon the transfer to her by Lawrence of the rights which he had acquired by Virgil's death, assigned all of their rights to Claire and acknowledged that thereafter they were holding them for her benefit. The whole chain of events, therefore, in our judgment not only shows that Virgil had no intention of being or becoming a creditor of Walston & Co., but that Claire likewise had no such intention in so far as the $75,000 note of her husband is concerned. The $48,000 note is in a different category and the respondent has acquiesced in her treatment of it for tax purposes.

It is even more obvious that no relation of debtor and creditor existed between Elkus and Virgil during his lifetime or between Elkus and petitioner. He was a mere figurehead or straw man, set up for the purpose of concealing the fact that Virgil had invested $62,500 in the securities business. His situation was not changed after the assignment to Claire.

Petitioner's contention that she, being on the cash basis, may be taxed only upon the income actually received is sound as an abstract principle. If, however, she was a member of a joint venture after the acquisition of Virgil's rights, and we are of the opinion that she was, cf. *First Mechanics Bank of Trenton, N. J* v. *Commissioner*, 91 Fed. (2d) 275, then she should have included in her gross income, "whether or not distribution is made," her distributable share of the ordinary net income of such joint venture and her allocable portion of its short term and long term gains or losses. (Sec. 182, *supra*.) Since the adjustments made by the respondent merely apply this statutory provision, they seem to be correct.

As a background for discussion of petitioner's alternative contentions and especially the last one it may be helpful to repeat some of the facts. Virgil died April 28, 1938, and Lawrence made the assignment to petitioner on May 31, 1938. According to the books of Walston & Co. the result of its operations for the first four months of 1938 was a loss of $19,879 55. Included in this, however, was a mere write-down, of securities in the amount of $8,841.35. The loss as to this amount, which was a short term loss, was not actually sustained until the securities were sold in May. May was otherwise an unprofitable month; so if petitioner's major alternative contention is denied—that it was improper "to change the accounting basis of the partnership to determine the profits distributable to her"—then she contends the change should be effective from the date of Virgil's death rather than from the date of the assignment. The effect of adopting this postulate would be to give her the benefit of a portion of the short term capital loss, thereby reducing her short term capital gains, and also to reduce substantially her ordinary income.

There is no evidence upon which a conclusion could be based that the date of Virgil's death is the controlling date. The assignment was made by Lawrence to Claire on May 31, 1938, and on the same date Elkus and the trustees made their assignments to her  So far as any "change in the accounting basis" is concerned, respondent does not suggest that the accounting basis of Walston & Co. should be changed. He merely contends that after May 31, 1938, but only after that date, Claire was a joint venturer. That being so, he has computed the ordinary income and the short term and long term gains and losses sustained by her and her co-adventurers after that date.

While we are convinced that the adjustments made by the respondent were proper, one, discussed at some length by the petitioner, should be noticed in more detail, viz., the $9,020.17 long term capital loss upon the liquidation of the San Francisco Curb Exchange, in which Walston & Co. had a membership. The stipulated facts show that the membership cost $11,990.45 in 1933, that the exchange was

disbanded in 1938, at which time its assets were liquidated, and that Walston & Co. received $2,500 as a preliminary distribution on May 16, 1938, and $470.28 as a final distribution on June 27, 1938. Under section 117 (b) of the Revenue Act of 1938 only 50 percent of a long term capital loss is to be taken into account in computing net income. Petitioner, in her income tax return for 1938, claimed 55 percent of $4,510.09 (one-half of the long term capital loss of Walston & Co. for the year), or $2,480.54, as a capital loss and also one-half of the capital loss allocable to her husband, they reporting their income on a community basis. The latter loss has been allowed and is not in issue.

The Commissioner determined that the $2,480.54 is not deductible by petitioner. Other facts shown by the record and having some bearing upon the question should be stated at this juncture. As shown in the summary of the stipulated facts, the parties in interest determined that as of the date of Virgil's death the adjusted net worth of Walston & Co., after a write-down of $25,470.90 of stock exchange seats to their current market value, was $202,649.55. On that basis they determined that a 20 percent interest in Walston & Co. had a value of $40,529.91 and this amount was paid by Claire to Virgil's estate, she, at the same time, assuming the payment of the $4,400 due to Lawrence on the $24,400 note. On the basis of these additional facts the Commissioner concluded that the value of the curb membership when petitioner acquired her interest by transfer from Lawrence was not in excess of $2,970.28, the amount ultimately received, and that her basis was not in excess of her allocable part of the amount realized.[6]

The record is not entirely clear, but apparently the write-down had given full effect to the shrinkage in value of this particular asset. That being so, it would follow that petitioner sustained no loss when the joint-venture of which she was a member recovered its basis. Cf. *Pratt-Mallory Co.* v. *United States* (Ct. Cls.), 12 Fed. Supp. 1020.

Cases cited by petitioner in which the estate of a deceased partner has continued the partnership of which he was a member at the time of his death and cases in which new members have been admitted to a continuing partnership have been examined but are not particularly helpful. The stipulated facts do not indicate that the estate elected to continue Virgil's joint venture after his death. We accept what seems to have been Virgil's postulate—that he had not been a partner in Walston & Co., but that he had been a joint venturer with his

---

[6] In the notice of deficiency it is stated "* * * In the valuation of the partnership interest for estate tax purposes * * * allowance was made for the loss in value of this exchange membership and it was appraised at its ultimate realization value. Due to the transfer of the decedent's interest to you, the estate tax valuation becomes the proper basis to you for the computation of subsequent gain or loss."

brother-in-law Hoffman, Walston, Smith, and Hoelscher through Elkus and the trustees.[7] This joint venture, however, terminated with his death. The memorandum which he had given to Lawrence and which Lawrence assigned to Claire gave her the right to purchase "all of the said property and rights" upon the payment of the $4,400 due on the note and the payment to his estate "of a sum equal to the value at the time of * * * [his] death of a 20% percent interest in the said business of Walston & Co." All assets and liabilities, including stock exchange membership, were to be figured at their current market value on the date of his death. This was done and it was determined that Claire should pay the additional amount of $40,529.91. Thus Claire acquired a capital asset worth approximately $158,000 upon the payment of $44,929.91. She then elected to carry on a joint venture with her husband Hoffman and his associates through Elkus and the trustees. It is perfectly obvious that the losses sustained by Virgil in his joint venture can not be carried forward into the joint venture established by Claire. They were taken into consideration in determining the amount which was to be paid by her for his interest. As we view the stipulated facts the Commissioner correctly held that petitioner should include in gross income her aliquot portion of the profits derived by her joint venture. By a parity of reasoning she may deduct her allocable part of the capital losses sustained. We are therefore of the opinion and hold that respondent committed no error in determining the deficiency in tax in Docket No. 108314.

## Issue II.

### Additional Facts Particularly Applicable to the Estate Tax Liability of the Estate of Virgil D. Giannini. (Docket No. 110341.)

A. P. Giannini is the duly qualified administrator of Virgil's estate. Virgil had never married and died without issue on April 28, 1938, at the age of 37. An estate tax return was filed with the collector of internal revenue for the first district of California. The administrator elected to value the property included in gross estate under section 811 (j), I. R. C., i. e., as of the date one year after decedent's death. This section requires that property sold, exchanged, or otherwise disposed of "shall be included at its value as of the time of such * * * disposition." In schedule F of the return "Option agreement held by Claire Hoffman" was reported at a value of $44,929 91.

In the notice of deficiency the Commissioner determined that the net amount includible in Virgil's estate in connection with his investment

---

[7] In his return for 1937 Virgil reported as "Income (or loss) from partnerships, syndicates, pools, etc." with an explanatory note "C. de Y. Elkus", $5,617.46.

in Walston & Co. and in the $47,000 note of Hoffman was $154,057.26, computed as follows:

| | |
|---|---:|
| 55% interest in Walston & Co. (55% of $202,649.55) | $111,457.26 |
| Note of C. P. Hoffman | 47,000.00 |
| | 158,457.26 |
| Less decedent's debt to L. M. Giannini Trust | 4,400.00 |
| Net amount | 154,057.26 |

$202,649.55 was the adjusted net worth of Walston & Co. as determined by the interested parties as of April 29, 1938. The adjusted net worth of Walston & Co. on May 31, 1938, was $190,000. The fair market value of the Hoffman note for $48,000 upon which $1,000 had been paid was $47,000.

### OPINION.

All of the errors assigned in the petition filed by the administrator have been abandoned except two. The one based upon the inclusion in gross estate of $46,072.04 in connection with property transferred to the Giannini family trust will be discussed as issue III. The present issue is whether respondent erred in including·in gross estate any amount in excess of $40,529.91.

Petitioner contends that the option given by the decedent to his brother, Lawrence, by the agreement of December 17, 1932, and its subsequent amendments, fixed the value of decedent's interest in Walston & Co. and in the Hoffman notes for estate tax purposes. His argument proceeds substantially as follows: Where property includible in gross estate is subject, at the date of death, to an option to purchase for a fixed or determinable sum, the fair market value for estate tax purposes can not exceed the price so fixed.

Before examining the cases relied upon by petitioner it is fitting to recall the basic facts. When the memorandum was originally delivered Virgil had invested, through Elkus, $26,520 and owned 51 percent of the total capital ($52,000) of the firm. The three general partners, collectively, had invested but $3,980, the remainder of the capital having been furnished to them by Virgil under agreements the essence of which was that the interests of the makers of the notes, given for the balance of their capital investments, could be taken over by Virgil at any time by assuming all of the makers' then liabilities under the notes. Thus Virgil's total investment was $48,020, $24,000 of which had been borrowed from the trust established by Lawrence.

The effect of the option at the time it was given was to enable Lawrence (or his assigns) to step into Virgil's shoes upon the payment of the $24,400 note plus an additional amount equal to a 20 percent interest in Walston & Co. Just why this particular percentage was

agreed upon can not be gleaned from the record. As the years passed, Virgil paid off most of the note—all except $4,400—and invested substantial additional amounts in the enterprise until, at the time of his death, he had a capital investment in it (through Elkus and the trustees) amounting to $137,500. In addition he had loaned his brother-in-law, through Claire, $47,000 to be invested in the same enterprise and had taken his note for that amount. Thus the so-called option, which had been modified to include these additional amounts, gave Lawrence the right to acquire his brother-in-law's $47,000 note and Virgil's total capital investment of $137,500 (which, however, due to capital losses and write-downs had an actual value of not to exceed $111,457.26) or property having an aggregate value of $158,457.26 upon the payment of $44,929.91. Respondent concedes that $4,400 is a proper off-set, since it represents borrowed capital; so the controversy which evolves is whether the amount to be included in gross estate is the actual value of the property less the loan—$154,057.26—or the amount which Claire, as the assignee of the option, was required to pay—$40,529.91.

The cases relied upon by the petitioners[8] all involved restrictive agreements upon the sale by the deceased owner of corporate stock. In the *Wilson* case reciprocal agreements had been made by three stockholders, who owned all of the shares of a corporation, under which either of the two could purchase the stock of the third at an agreed price. In the *Lomb* case an agreement had been made by the stockholders whereby none could sell his stock without first offering it to the others, who were to have the right to purchase in proportion to their common stockholdings at approximately $69 per share. In the *Bensel* case a son had been given an option to purchase his father's shares because he "was demanding protection and the father realized that the corporation, in which he was the largest stockholder, would lose the services of a valuable employee unless the agreements were entered into." In the *Mitchell* case the deceased stockholder had agreed that his surviving partner could purchase the stock for less than its value, the proceeds of insurance carried by the firm "to provide for the purchase price or a part of the purchase" making up the difference. The *Salvage* case applied the same basic principle, the Court remarking: "Considering the option to repurchase [stock] at par, outstanding in 1922, there could be no proper finding of fair market value at that time in excess of $100 per share."

The opinion of the Board in the *Bensel* case suggests the reason for, though we do not intend to imply that it completely delimits the extent of, the rule relied upon by petitioner. Thus the fact that

[8] *Wilson* v. *Bowers*, 57 Fed. (2d) 682; *Lomb* v. *Sugden*, 82 Fed. (2d) 166; *Bensel* v. *Commissioner*, 100 Fed. (2d) 639, affirming *Edith M. Bensel et al., Executors*, 36 B. T. A. 246; *Estate of John T. H. Mitchell*, 37 B. T. A. 1; and *Helvering* v. *Salvage*, 297 U. S. 106.

the option is given to one who is the natural object of the bounty of the optionor requires substantial proof to show that it rested upon full and adequate consideration. Whether an unilateral agreement made by an unmarried man to his brother constitutes an enforceable contract is at least a debatable question. There is no showing that Virgil was indebted to his brother in any amount, nor was the brother required to do more than elect whether he would take the property upon the terms specified. If the agreement were fair and reasonable when originally entered into, would it be upheld by a court—no reciprocity being shown—when the actual investment of the donor or optionor had been more than quadrupled? In the event of litigation between the other heirs at law of the optionor and the optionee, would a court have upheld the agreement? Was the so-called option a valid substitute for testamentary disposition of the property? While none of these questions need be answered, they suggest that there must be some limit to the passage of substantial property rights under a unilateral agreement granting to the natural object of the bounty of a deceased an option to purchase at a grossly inadequate price. In other words, we are of the opinion that while a bona fide contract, based upon adequate consideration, to sell property for less than its value may fix the value of the property for the purposes of the estate tax, a mere gratuitous promise to permit some favored individual, particularly the natural object of the bounty of the promissor. to purchase it at a grossly inadequate price can have no such effect.

In view of some of petitioner's argument it will not be amiss to refer briefly to the effect of what he refers to as the "option" given by Virgil to Lawrence. In the cases cited by him the optionee had been given an unqualified right to purchase at a designated price and the optionor could not dispose of the property during the continuance of the option. Such an option restricts the market value of the property in the hands of the owner. *Helvering* v. *Salvage, supra*; cf. *Edwards* v. *Slocum*, 264 U. S. 61. Virgil, however, could have disposed of his interest in Walston & Co. and the note of Hoffman upon any terms or conditions he saw fit to impose and at any time he saw fit to do so. No argument is required to show that such an option did not restrict or limit the value of the property in his hands. Cf. *Krauss* v. *United States*, 50 Fed. Supp. 388 (Dist. Ct. E. Dist. La., Aug. 5, 1943.)

But our conclusion that the respondent committed no error in including the property in gross estate at its actual value need not rest solely upon what has been said. The option indicates it was intended to take effect in possession and enjoyment at or after the optionor's death and therefore the fair market value of the property is includible

in gross estate under the rationale of *Helvering* v. *Hallock*, 309 U. S. 106. Moreover the applicable provisions of the revenue act [9] require that there be included in gross estate the value, at the time of death, of all property, real or personal, tangible or intangible, wherever situated, "to the extent of the interest therein of the decedent at the time of his death." It can not be gainsaid that the interest of the decedent in the property n issue at the time of his death was approximately the amount determined by the respondent rather than the amount required to be paid by Lawrence or his assignee.

The word "approximately" in the preceding sentence has been used advisedly and because of our finding that the net worth of Walston & Co. on the basic date was less than respondent determined it to be. He has used the net worth on April 29, 1938, although he urges and we hold that the basic date was May 31, 1938. There is not a great deal of evidence upon which a conclusion can be based that the value on the latter date was less than on the former; nor is the evidence, relied upon by petitioner to show that the net worth on April 29 was substantially less than the interested parties determined it to be, very persuasive. We therefore decline to make the findings suggested by the administrator—that the net worth of Walston & Co. was not in excess of $182,085.45 and the $47,000 note of Hoffman was without value—and have found as a fact that the net worth on the basic date was $190,000. Decedent's 55 percent interest therein was therefore $104,500. The fair market value of the Hoffman note has not been shown to have been less than $47,000.

Petitioner's alternative contention is that the property should be valued as of April 29, 1939 (one year after Virgil's death), since petitioner elected to value the property of the estate under section 811 (j), I. R. C. This is without substance, inasmuch as the section specifically requires that property sold or otherwise disposed of be included at its value as of the time of such disposition. We have therefore determined that May 31, 1938, is the applicable date.

The net amount to be included in gross estate in connection with the items in controversy is $147,100 ($104,500 plus $47,000, less $4,400).

## Issue III.

*Facts Pertaining to Liability of Estate of Virgil D. Giannini for Additional Taxes in Connection with Giannini Family Trust. (Docket No. 110341.)*

The stock of the A. P. Giannini Co. was owned by A. P. Giannini, his wife, and their three children, Lawrence, Virgil, and Claire. The children had acquired their stock by gift from their father. The

---

[9] Secs. 301 and 302, Revenue Act of 1926 as amended.

company was dissolved, apparently [10] on or about October 1, 1935. A. P. Giannini thought the property could be better handled and would be worth more if kept together. Also he and his wife wished "to have the children independent, to some day set up a fund that would take care of them always." With those thoughts in mind he suggested to the children that, if they would place their property (so acquired) in a trust, he and his wife would do likewise and "would retain no interest in it."

Pursuant to the suggestion of A. P. Giannini, he, his wife, and his three children, on October 1, 1935, delivered to Bank of America National Trust & Savings Association, as trustee, deeds to the real estate and conveyance of title to the personal property described in an attached schedule.* This consisted of real estate, stocks, and bonds having an aggregate value of $933,816.13, subject to mortgages and other indebtedness amounting to $476,776.17. The net value of the property was owned in the following proportions:

| | |
|---|---|
| A. P. Giannini | $179,320.75 |
| C. A. Giannini | 147,865.37 |
| L. M. Giannini | 43,284.60 |
| Claire G. Hoffman | 43,284.82 |
| Virgil D. Giannini | 43,284.62 |
| Total | 457,039.96 |

The trustee was given broad powers in handling the trust estate. Summarizing them, it, in the language of the instrument was to "have unrestricted powers in the same manner as if * * * [it] were an ordinary individual who was the absolute owned * * *." Lawrence, Virgil, and Claire were the named beneficiaries. The trust provided, *interalia:*

### ARTICLE VII.

During the continuance of this trust, the Trustee shall, at regular intervals to be determined by said Trustee, to the extent that income is in its hands and after payment of any taxes, fees of Trustee, fees or compensation of any managing agent, fees of any attorney for the Trustee and any other charges, distribute the net income from the trust estate in equal shares to the said L. M. GIANNINI, VIRGIL D. GIANNINI and CLAIRE GIANNINI HOFFMAN, or if any of them be deceased, to his or her nominee or nominees, as hereinafter provided for, the nominee and/or nominees of a single beneficiary taking only the income to which their nominating beneficiary would be entitled were he or she living; provided, however, that in the event there exists any indebtedness for which the trust estate has in any way been pledged or encumbered, or for which indebtedness the trust estate is in any way liable, the Trustee shall have absolute discretion as to the amount of income to be paid to the beneficiaries and/or nominees and may in its discretion withhold

[10] The details of the stock ownership, dissolution, etc., of the company are not shown by the record. A. P. Giannini testified that when it was dissolved the distributive shares of the liquidating dividends were transferred to the trust. We assume, for present purposes, that the dissolution occurred on October 1, 1935.

any or all of the income for application against said indebtedness; it is contemplated that as long as said indebtedness exists said Trustee will apply reasonable amounts of said income towards the extinguishment of said indebtedness.

### ARTICLE VIII.

The primary interest of each of the said beneficiaries in the income and corpus of this trust is an equal ONE-THIRD thereof.

Each beneficiary herein is hereby granted the right to name his or her natural child or children (not in any event any adopted child or children) or a single child whether or not there be more than one child, as a nominee and/or nominees to take upon the death of the said beneficiary his or her respective interest in this trust, plus any augmentation and/or accumulation thereof. Said nominee and/or nominees must be named in the Last Will and Testament admitted to probate of such nominating beneficiary. Any beneficiary may also, either by will or by agreement, name a trustee to be a nominee provided that the beneficiaries under any trust so created are the persons heretofore defined as possible nominees.

    *       *       *       *       *       *       *

In the event any beneficiary fails to nominate any nominee as herein provided for, or in the event any nomination shall fail for any reason, then upon the death of such beneficiary, his or her share or interest in this trust and the income and corpus thereof shall cease and said share or interest shall be continued in trust to augment the share or interest of the surviving beneficiary or beneficiaries and/or nominee or nominees, proportionately according to the interest that such surviving beneficiaries and nominees have in said trust estate.

    *       *       *       *       *       *       *

### ARTICLE XI.

This trust is and shall remain *irrevocable*. This indenture is intended to and does divest the trustors [naming all five] at the time of the execution of this instrument, of all his, her and their right, title, interest and estate in and to said trust estate and the earnings and income therefrom, except that Trustors [naming the three children] retain certain rights, and vests title thereto in the Trustee and its successors in trust for the purposes herein provided. The said Trustors retain no beneficial interest, right or estate of any kind or character in said trust estate, other than the rights herein reserved to the Trustors [naming the three children] in their capacity as beneficiaries * * *:

The trust instrument provides that each and every beneficiary or nominee thereunder shall be without "right, power and authority to sell, assign, pledge, mortgage or in any other manner to encumber, anticipate or impair his or her beneficial or legal interest in the trust or any part thereof and no part of the income or principal of the trust shall be subject to the claims of any creditor of any of the beneficiaries or nominees." The trust is to cease and terminate upon the death of the last survivor of the beneficiaries named therein, whereupon the trustee is directed to distribute the trust estate remaining in its hands to the surviving nominee or nominees.

The trust instrument was signed by the five trustors and by the trustee. It was signed again by Lawrence, Virgil, and Claire below a statement reading as follows: "The undersigned, being beneficiaries named in the foregoing Trust Agreement, hereby accept the gifts therein declared."

The value of the trust estate "at the appropriate basic date elected by the executor" was $498,076.10. The respondent determined that, since the decedent contributed 9.25 percent of the net value of the property to the trust at the time of its creation, the same percentage of the net value of the trust on the basic date should be included in his gross estate. He determined such amount to be $46,072.04 and included that amount in gross estate.

The net income of the trust from October 1, 1935, through December 31, 1938, was as follows:

| | |
|---|---|
| Oct. 1 to Dec. 31, 1935 | $5, 752. 60 |
| For the year 1936 | 82, 968. 70 |
| For the year 1937 | 12, 514. 02 |
| For the year 1938 | 70, 261. 74 |

or an average net income in excess of 9 percent per annum.

The fair value of the right of a man 35 years of age—which was Virgil's age at the time the trust was created—to receive one-third of the income for life from property having a value of $457,039.96 was substantially in excess of the amount contributed to the trust by Virgil ($43,284.62).

The net worth of the trust, as of December 31 of each of the indicated years, was as follows:

| | |
|---|---|
| 1935 | $461, 496. 56 |
| 1936 | 544, 465. 26 |
| 1937 | 571, 979. 28 |
| 1938 | 642, 241. 02 |

### OPINION.

The issue is whether any amount is includible in gross estate under section 302 (c) of the Revenue Act of 1926 as amended [11] and the applicable regulations.[12] The value on the basic date is not contested.

Petitioner contends that the transfer on October 1, 1935, was "a bona fide sale for an adequate and full consideration in money or money's worth" and hence specifically excepted by the statute. If not a sale, he urges that it was nevertheless a "transfer * * * for a consideration in money or money's worth", the consideration being

---

[11] Sec. 302 (c), as amended by sec. 803, Revenue Act of 1932;

The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

*   *   *   *   *   *   *

(c) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, or of which he has at any time made a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; except in case of a bona fide sale for an adequate and full consideration in money or money's worth. * * *

[12] Art. 15 *et seq.*, Regulations 80 (1937 Ed.)

**1184**

in excess of the value of the property transferred, and therefore that no part of the property may be included in gross estate because of the provisions of section 302 (i) of the Revenue Act of 1926.[13] In the alternative he argues that the decedent retained only one-third of the income from the property which he transferred to the trust and, at most, only one-third of the value of the transferred property may be included in gross estate. These contentions will be considered in the order stated

Petitioner contends that there was a sale by Virgil within the construction placed by the Circuit Court of Appeals for the Third Circuit upon that term in *Ferguson* v. *Dickson*, 300 Fed. 961. We do not agree. In that case the decedent, prior to his death, had transferred a substantial portion of his property to a trust for the benefit of his intended wife and she had "released to her intended husband all the rights in his property, real and personal, which he then had or might thereafter acquire." The court quoted several definitions of a sale, among others Blackstone's (2 Blackstone 446) "a transmutation of property from one man to another in consideration of some price" and one given by the California Court of Appeals in *Yick Sung* v. *Herman*, 2 Cal. App. 633; 83 Pac. 1089, 1091, "a contract by which, for a consideration, one transfers to another property or an interest therein" and concluded that under the facts then before it a sale had been made. We accept that as sound, even though under the more recent revenue acts such property would now be included in gross estate (sec. 812, (b), I. R. C.); but under the present facts we can not find that any sale was made.

Inferentially it appears that petitioner's theory is that Virgil gave up property having a value of $43,284.62 for a more valuable right, i. e., the right to receive for life one-third of the income from property having a value of nearly a half million dollars, which an actuary testified and which we have found had a value in excess of $43,284.62. We have searched the record in vain for any indication of a *quid pro quo*. The trust instrument and the evidence indicates that the parents made a gift to their children which was accepted by them. *Helvering* v. *Hutchings*, 312 U. S. 393. Contemporaneously each of the children transferred to the same trust property having a value of $43,284.62, retaining "certain rights."

[13] Sec. 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

\* \* \* \* \* \*

(i) If any one of the transfers, trusts, interests, rights, or powers, enumerated and described in subdivisions (c), (d) and (f) of this section is made, created, exercised, or relinquished for a consideration in money or money's worth, but is not a bona fide sale for an adequate and full consideration in money or money s worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent.

If the view expressed in the preceding paragraph is correct then petitioner's second contention, as well as his first, must be found to be without substance; for if the transfer by the parents was a gift it is difficult to see how it could be "consideration in money or money's worth" for the transfer made by Virgil. Inasmuch as we are persuaded that the view taken is sound, the second contention will not be further discussed.

Under the postulate which has been adopted it is unimportant whether decedent, Lawrence, and Claire "retained" or "reserved" the income from his particular share of the property contributed to the trust or whether the trusts were reciprocal. If the former, as the trust instrument indicates, then Virgil's share was properly included in gross estate under the rationale of *Helvering* v. *Bullard*, 303 U. S. 297. If the latter, then, paraphrasing the language used in *Estate of Henry H. Scholler*, 44 B. T. A. 235, 237: All three transferred exactly the same quantum of property to the trust; all acquired equal interests in the trust so created by them and in its corpus. The death of Virgil, the first to die, was the occasion of an enlargement of the interest of each of the others. If his estate is not to include the value of the property transferred to the trust it must include the value at the time of his death of his interest in the trust, which comes to the same thing, since it is measured by the value of the property which he contributed. Cf. *Allen S. Lehman et al., Executors*, 39 B. T. A. 17; affd., *Lehman* v. *Commissioner*, 109 Fed. (2d) 99; certiorari denied, 310 U. S. 637; *Estate of Frederick Fish*, 45 B. T. A. 120.

## Issues IV and V.

*Additional Facts Particularly Applicable to Gift Tax Liability of Lawrence M. Giannini (Docket No. 110003) and Mercedes A. Giannini (Docket No. 110004).*

Lawrence M. Giannini and Mercedes A. Giannini are husband and wife residing in San Francisco, California. They were married April 7, 1929, and at all times since their marriage have been domiciled in California. Gift tax returns were filed for the calendar year 1938 with the collector of internal revenue for the first district of California. Neither included in total gifts any amount in connection with the transfer made by Lawrence to his sister Claire under the circumstances shown above and hereinafter referred to.

At the time of the death of Virgil, Lawrence was president of the Bank of America National Trust & Savings Association, a national banking association, which position he had held continuously since January 14, 1936. From the date of his marriage in 1929 to May 31, 1931, he received income as salary from the above mentioned bank,

from the A. P. Giannini Co., and from A. P. Giannini, in the approximate amount of $114,500.

Upon the establishment of the Vernon C. Walston security business in 1931 Lawrence advanced $24,400 to Elkus as shown in our general findings. This money was paid by check drawn on A. P. Giannini Co. In November 1932 Lawrence transferred his interest in Walston's business to his brother Virgil in return for a promissory note in the sum of $24,400. In December 1932 Virgil executed the document set out at length above.

At the time of the death of Virgil the promissory note had been reduced by payment to $4,400. The agreement of December 17, 1932, had been amended to include additional interests acquired by Virgil in Walston & Co. His interest in Walston & Co. has been stated above.

As an officer in the Bank of America National Trust & Savings Association, Lawrence could not have an interest in any business dealing in securities. On May 31, 1938, he assigned the option which had been given to him by his brother, Virgil, to his sister, Claire. She immediately exercised it, paid the balance due on Virgil's note in the amount of $4,400, and paid Virgil's estate $40,529.91 as shown above.

Respondent, in his notice of deficiency addressed to Lawrence (Docket 110003) stated:

In the Federal gift tax return filed by you for the year 1938 no sum was declared as the total amount of gifts, no amount declared as net gifts, but in a statement attached thereto it is indicated that you assigned to your sister, Claire Hoffman, an option to acquire the interest in Walston & Co., a partnership, held by Virgil D. Giannini upon his death. Information available indicates that at Virgil D. Giannini's death, April 28, 1938, his interest in Walston & Co. partnership was worth no less than $111,457.26 (55 percent of $202,649.55) plus the involved note of C. P. Hoffman (secured by a 20 percent interest in the partnership) of a face value of $47,000.00, a total of $158,457.26. By the terms of the option agreement (as ratified December 30, 1937, and March 9, 1938) you were required to pay an amount equal to a 20 percent interest in the partnership, or $40,529.91, and cancel the unpaid balance of Virgil D. Giannini's note to a trust created by you with the Bank of America N. T. & S. A., trustees, in the amount of $4,400.00, a total designated cost of $44,929.91. It is held that the excess of the value of sa'd partnership interest of Virgil D. Giannini over the purchase price provided by the option constitutes a transfer of property by gift, subject to gift tax under the provisions of section 501 and 503 of the Revenue Act of 1932, in the amount of $113,527.35.

In explanation of adjustments attached to the deficiency notice addressed to Mercedes A. Giannini, Docket 110004, the respondent stated:

In your Federal gift tax return for 1938 there was declared no total gifts and no net gifts. In the related gift tax case of your husband, L. M. Giannini, it is held that the assignment by him on May 31, 1938, to his sister, Claire Hoffman, of an option to acquire Virgil D. Giannini's interest in Walston & Co. partnership

following his death, which occurred April 28, 1938, constituted a gift of separate property by your husband in the amount of $113,527.35. Because it is alleged by you that the assignment of the option by your husband constituted a gift of community property, in order to protect the Government's interest it is held your 50 percent community interest in said transfer of property by gift amounts to $56,763.67 and total gifts for 1938 are accordingly increased by that amount.

The fair market value on May 31, 1938, of the option to acquire a 55 percent interest in Walston & Co. and the $47,000 note of C. P. Hoffman upon the payment of $44,929.91 was $106,570.09.

A gift of property having a value of $106,570.09 was made by Lawrence M. Giannini to his sister Claire Giannini Hoffman on May 31, 1938.

#### OPINION.

The finding which has been made is consistent with the finding made in the estate tax case, discussed as issue II. It is predicated primarily upon our conclusion that the net worth of Walston & Co. on the basic date was $190,000. A 55 percent interest on that basis, was $104,500 which, together with the Hoffman note for $47,000, makes a total value of $151,500. This was the property and property rights which Lawrence obtained upon the death of Virgil, provided payments aggregating $44,929.91 were made. The right to acquire the property upon the payment of slightly more than one-quarter of its actual value was transferred by Lawrence to his sister for a nominal consideration. It is obvious, therefore, that a gift was made. (Secs. 503 and 506, Revenue Act of 1934; *Commissioner* v. *Greene*, 119 Fed. (2d) 383; certiorari denied, 314 U. S. 641.)

The points relied upon by petitioner are: (1) The option had no fair market value; (2) the value determined by the respondent is excessive; and (3) the option was community property of Lawrence and his wife, Mercedes. The finding which has been made inferentially disposes of the first two contentions, especially the second. The first may appropriately be noticed briefly.

Petitioner cites *Helvering* v. *Walbridge*, 70 Fed. (2d) 683, and *Scherman* v. *Helvering*, 74 Fed. (2d) 742, as authorities for holding that the option had no fair market value. We do not so construe them. In the *Walbridge* case the Commissioner had attempted to tax a partner, who had contributed stock to a partnership, not only upon his share of the partnership profits but also with income which the Commissioner claimed had resulted from the stock having been taken by the partnership at a price in excess of its cost to the taxpayer. The court affirmed the Board's holding that this could not be done. The *Scherman* case merely held that a right of action to prevent an employee of a company from serving elsewhere, acquired indirectly by the company as a result of the sale of some of the com-

pany's stock to the employee by the principal stockholders for less than their actual value, could not be construed to be "property received" by the stockholders which had a fair market value capable of being off-set against the loss sustained by the stockholders upon the sale. Even if the cases be construed as holding that some rights may be too ephemeral for valuation—and we recognize that there are such—we do not believe those acquired by Lawrence and transferred to Claire were in such a category.

Petitioner (Lawrence) also argues that the option had no value in his hands because he, being president of a bank, could not own an interest in a securities business. Such argument overlooks the fact that he was free to dispose of it in any way he chose. He chose to give it to his sister. There is no evidence indicating that the right to acquire property having, as the interested parties determined, a value of $158,457.26 (but which we have determined was $151,500) did not have a fair market value equal to the difference between that amount and the relatively small sum which was required to be paid. We have therefore concluded and now hold that a gift of property having a value of $106,570.09 was made.

The remaining question is whether the gift was of separate or community property. The discussion of this question by the parties is confined almost exclusively to the effect of certain presumptions. Petitioners rely upon what they refer to as a presumption under California law that property acquired after marriage is community property unless shown to be separate. *In re Pepper's Estate*, 158 Cal. 619; 112 Pac. 62; *Pedder* v. *Commissioner*, 60 Fed. (2d) 866; *Freese* v. *Hibernia S. & L. Soc.*, 139 Cal. 392; 73 Pac. 172. The presumption is "evidentiary rather than substantive" (cf. *W. D. Johnson*, 1 T. C. 1041, 1054, on appeal, C. C. A., 8th Cir.) and it is at least questionable whether, standing alone, it is sufficient to overcome the presumption of correctness attaching to the Commissioner's determination to the contrary. *Herbert D. Robinson, Executor*, 21 B. T. A. 1373, 1379; affd., 63 Fed. (2) 652; certiorari denied, 289 U. S. 758; *Estate of Julian Peabody*, 41 B. T. A. 1, 3; *James Lewis Caldwell McFaddin*, 2 T. C. 395, 406, *et seq.* It is obvious from an examination of the two notices of deficiency that respondent's real determination is that the property was the separate property of Lawrence. His holding in the other deficiency notice, however, does militate against him, though whether it completely destroys the presumption in Lawrence's case need not be decided. The whole question of the effect of the various presumptions is so befogged that a more direct approach to the issue should be taken.

The evidence shows that Lawrence's original investment in Walston & Co. was made by check of the A. P. Giannini Co., which was

charged to his account. Lawrence had acquired his interest in A. P. Giannini Co. prior to his marriage. Respondent attempts to spell out of this circumstance an original purchase, with separate and individual funds, of the property ultimately transferred to Claire. Petitioner, pointing to the fact that Lawrence's account with the company probably included salary accumulations, earned after marriage, contends that the purchase was made with community funds. As we view it the evidence supports neither contention. Lawrence's original investment was wholly repaid to him. Virgil paid him $20,000 and Claire assumed the payment of the remaining $4,400. Therefore all that Lawrence gave to Claire was the difference between the value of the property which he acquired or became entitled to receive upon Virgil's death (a 55 percent interest in Walston & Co. having a value of $104,500 plus Hoffman's $47,000 note) and the amount required to be paid ($44,929.91). Thus he made a gift to his sister of property having a value of $106,570.09.

The property which Lawrence gave to Claire had come to him upon the death of Virgil. He paid nothing for it. It is reasonable to conclude, therefore, that he acquired it by "gift, bequest, devise or descent." Cf. *Lyeth* v. *Hoey*, 305 U. S. 188. It was therefore his separate property. It follows that respondent erred in including any amount in gifts made by Mercedes A. Giannini. His inclusion of the value determined by us in gifts made by Lawrence is approved.

> *Decision will be entered for the respondent in Docket 108314. Decision will be entered for the petitioner in Docket 110004. Decision will be entered under Rule 50 in Dockets 110341 and 110003.*